## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MICHAEL WADE NANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: |
| TIMOTHY C. WARD, Commissioner, | ) | |
| Georgia Department of Corrections, | ) | |
| | ) | |
| BENJAMIN FORD, Warden, | ) | |
| Georgia Diagnostic and Classification | ) | |
| Prison, | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT OF MICHAEL WADE NANCE

1.  This is an action by Michael Wade Nance seeking to have the court order Defendants not to execute Mr. Nance under their current execution policies and procedures and to enforce Mr. Nance's rights under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution.

2.  Mr. Nance is a death-sentenced prisoner whom Defendants intend to execute by lethal injection. Mr. Nance's veins are extremely difficult to locate through visual examination, and those veins that are visible are severely compromised and unsuitable for sustained intravenous access. If Defendants attempt to execute Mr. Nance by lethal injection, there is a substantial risk that Mr.

Nance's veins will lose their structural integrity and "blow," leading to the leakage of the lethal injection drug into the surrounding tissue. The leakage of the lethal injection drug causes intense pain and burning in the surrounding tissue, and also results in inadequate or inconsistent drug delivery, leading to a prolonged execution that will produce excruciating pain. .

3.     In addition, Mr. Nance has been taking increasing dosages of prescription gabapentin for several years to treat chronic back pain. Mr. Nance's continuous exposure to gabapentin has altered his brain chemistry in such a way that pentobarbital will no longer reliably render him unconscious and insensate, further creating and exacerbating the substantial risk that Mr. Nance will consciously suffer a prolonged and painful execution.

4.     Accordingly, Defendants' current execution protocol presents a substantial risk of serious harm to Mr. Nance that is objectively intolerable, in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Defendants could avoid subjecting Mr. Nance to a gratuitously painful execution by implementing a readily available alternative, namely death by firing squad, which would significantly reduce the substantial risk of severe pain.

## THE PARTIES

5.      Plaintiff Michael Nance is a United States citizen and resident of the State of Georgia. He is a death-sentenced prisoner currently being held in the custody of Defendants at the Georgia Diagnostic and Classification Prison (the "Prison") in Jackson, Georgia.

6.      Defendant Timothy C. Ward is the commissioner of the Georgia Department of Corrections ("DOC"), which is headquartered in Atlanta, Georgia. He is being sued here in his official capacity.

7.      As commissioner, Defendant Ward is responsible for the supervision, direction, and execution of operations at the DOC.

8.      Ward has a duty to ensure that executions are carried out in compliance with DOC procedure.

9.      Ward also has a duty to ensure that executions are carried out in a manner consistent with and not in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

10.     Defendant Benjamin Ford is the warden of the Prison. He is being sued here in his official capacity.

11.     As warden, Defendant Ford is responsible for the day-to-day operations of the prison.

12.     Ford has a duty to ensure that executions are carried out in compliance with DOC procedure.

13.     Ford also has a duty to ensure that executions are carried out in a manner consistent with and not in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION

14.     Jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 23 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

15.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b).

## PROCEDURAL HISTORY

16.     In the Superior Court of Gwinnett County in 1997, a jury convicted Mr. Nance for malice murder and five other crimes and sentenced him to death.

17.     On direct appeal, the Georgia Supreme Court affirmed Mr. Nance's convictions but reversed his death sentence.

18.     A new sentencing trial in 2002 resulted in a new death sentence, which the Georgia Supreme Court affirmed on direct appeal.

19.     Mr. Nance then filed a petition for collateral relief in the Superior Court of Butts County. That court granted him relief from the death sentence after concluding that Mr. Nance had received ineffective assistance of counsel at the resentencing trial. The State appealed.

20.     In 2013, the Georgia Supreme Court reversed.

21.     At the end of 2013, Mr. Nance filed a 28 U.S.C. § 2254 petition in this Court. In 2017, this Court denied relief but granted a certificate of appealability on two of Mr. Nance's claims: (1) his trial counsel were ineffective in presenting his case in mitigation, and (2) the trial court erred in requiring him to wear a stun belt during the resentencing trial.

22.     On April 30, 2019, the United States Court of Appeals for the Eleventh Circuit rejected Mr. Nance's claims and affirmed the decision by the Georgia Supreme Court.

23.     Mr. Nance filed a petition for certiorari review in the Supreme Court of the United States on December 9, 2019. Mr. Nance's petition for certiorari is currently pending before the Supreme Court.

## FACTUAL BACKGROUND

### A. Georgia's Lethal Injection Procedure.

24.     The Georgia Code states that "[a]ll persons who have been convicted of a capital offense and have had imposed upon them a sentence of death shall suffer such punishment by lethal injection." O.C.G.A. § 17-10-38(a).

25.     The Georgia Code defines "[l]ethal injection" as "the continuous intravenous injection of a substance or substances sufficient to cause death into the body of the person sentenced to death until such person is dead." *Id*.

26.     In conducting an execution, the DOC and the Prison maintain and follow the Lethal Injection Procedures (attached as **Exhibit 1**, hereinafter "Protocol" or "Protocols").

27.     The Protocol specifies that a single drug—compounded pentobarbital—is to be used for all lethal injections.

28.     Defendants obtain the compounded pentobarbital used in lethal injections from a compounding pharmacy.

29.     The identity of the compounding pharmacy that manufactures the pentobarbital for executions is a confidential state secret. O.C.G.A. § 42-5-36(d).

30.     The origin and identity of the ingredients used by the compounding pharmacy to manufacture the pentobarbital is also a confidential state secret. *Id.*

31.     The compounded pentobarbital used by Defendants to carry out executions is not subject to the Food and Drug Administration's (FDA) drug-approval process or manufacturing standards. Consequently, Defendants' compounded pentobarbital has not met the FDA's standards for quality, potency, purity and stability.

32.     Upon information and belief, the compounding pharmacy that manufactures Defendant's compounded pentobarbital does not test the compounded pentobarbital for quality, potency, purity or stability prior to delivering it to Defendants.

33.     Since 2015, there have been problems with the quality of the pentobarbital possessed by the State of Georgia for use in executions, including pentobarbital that has appeared cloudy. Because of the secrecy surrounding Georgia's sourcing of the drug, there is no assurance that the quality, potency, purity or stability of the drug is consistent with accepted medical practice or industry standards.

34.     The Protocol states that two physicians must be present at the execution to "determine when death supervenes" and "provide medical assistance during the execution." *Id.*

35.     The Protocol also requires an "IV Team" to be present for executions. The IV Team must "consist of two (2) or more trained personnel, including at least one (1) Nurse, to provide intravenous access." *Id.*

36.     The Protocol also requires an "Injection Team" to be present for executions. The Injection Team consists of "three (3) trained staff members to inject solutions into the intravenous port(s) during the execution process." *Id.*

37.     The IV Team is responsible for providing "two (2) intravenous accesses into the condemned. If the veins are such that intravenous access cannot be provided, a Physician will provide access by central venous cannulation or other medically approved alternative." *Id.* at 4.

38.     Under the Protocol, members of the Injection Team inject five grams of compounded pentobarbital into the IV from which the drug is delivered to the prisoner. *Id.* at 5. The Injection Team must inject three different syringes—the first two syringes each containing 2.5 mg of pentobarbital, the third syringe containing 60 cubic centimeters of saline. *Id.*

39.     The Injection Team is not in the same room as the condemned and administers the pentobarbital remotely through many feet of IV tubing. Upon information and belief, this necessitates the use of several 72-inch extension sets of tubing.

40.     This unnecessarily increases the risk of leakage and/or pinching of the tubing, thereby creating a greater risk that the prisoner will not receive the full dose of pentobarbital.

41.     Further, the longer the IV tubing, the longer the injected drugs will be in contact with the walls of the tubing. This allows resistance to play a larger role in the overall flow of the drugs and introduces significantly more variation and risk into the process.

42.     Also, the only effective means of detecting problems with the IV is to gauge the amount of resistance in the tubing, an assessment that is made more difficult with longer IV tubing. Additionally, the execution team, on information and belief, does not possess the training necessary to gauge this resistance.

43.     Thus, the fact that the drug is injected into the IV in another room and must travel through many feet of IV tubing with 60 cubic centimeters of saline before reaching the prisoner's vein creates a substantial risk that the intended fatal dose of pentobarbital is not delivered consistently or completely to the prisoner.

44.     Under the Protocol, the Warden is authorized to instruct the Injection Team to administer an additional dose of 5 mg of pentobarbital, and an additional 60 cubic centimeters of saline, if the prisoner still exhibits visible signs of life. *Id.*

45.     The Warden is also authorized to repeat the entire process over again, should the prisoner continue to exhibit signs of life after the completion of the injections. *Id.*

46.     Georgia has executed twenty-one (21) persons with compounded pentobarbital under the Protocol. The range in duration of the executions spans from at least eight (8) to twenty-seven (27) minutes.

47.     The autopsies of at least fifteen (15) of those individuals reveal that each suffered a significant degree of fluid congestion in their lungs, while at least seven (7) experienced fulminant pulmonary edema.

**B. Mr. Nance's Severely Compromised Veins.**

48.     Mr. Nance's veins are severely compromised.

49.     When receiving medical attention that requires blood to be drawn, medical technicians have difficulty locating a suitable vein in Mr. Nance.

50.     Obtaining and maintaining intravenous access as required in a lethal injection is more invasive and requires far more venous structural integrity than drawing blood.

51.     On or around May 2019, a medical technician at the Prison told Mr. Nance that if he were to be executed by lethal injection, the execution team would

have to cut his neck to carry out the execution because they would not otherwise be able to obtain sustained intravenous access.

52.     Upon information and belief, the medical technician was referring either to a procedure whereby the execution team would obtain sustained venous access through central venous cannulation or a surgical procedure known as a cutdown.

53.     Mr. Nance had a physical examination by an anesthesiologist on October 28, 2019.

54.     The examination revealed that there are no discernible veins on visual examination in Mr. Nance's forearms or left or right antecubital fossa and that Mr. Nance's lower extremities also lack visible and palpable veins.

55.     The insertion of an intravenous catheter into Mr. Nance for a lethal injection will likely require multiple painful needle insertions and blind attempts by the IV team to locate a suitable vein.

56.     The veins that are discernible in Mr. Nance, either through sight or touch, are heavily scarred, tortuous, and have thin walls.

57.     Insertion of an intravenous catheter into a scarred and tortuous vein is extremely difficult and presents a substantial risk that the vein will "blow" and lose

its structural integrity, causing the injected pentobarbital to leak into the surrounding tissue.

58.     The medical term for this leakage is extravasation.

59.     The extravasation of pentobarbital due to a blown vein would cause Mr. Nance to experience intense and painful burning in the surrounding tissue.

60.     The extravasation of pentobarbital due to a blown vein would also lead to incomplete and inconsistent drug delivery to Mr. Nance, which would result in a prolonged and only partially anesthetized execution wherein Mr. Nance would experience the excruciating feeling of suffocating to death.

61.     In addition, the fact that, under the Protocol, the Injection Team is not in the same room as the condemned and administers the pentobarbital remotely through many feet of IV tubing significantly lessens the probability that the Injection Team would even be aware of a blown vein when it occurs, making it very unlikely that the Injection Team could recognize the extravasation and take appropriate action in a timely manner.

## C.   Alternatives to Intravenous Access.

62.     The Protocol specifies central venous cannulation as an alternative method of injection if intravenous access cannot otherwise be established. Exhibit 1, at 4.

63.    Central venous cannulation entails inserting a catheter into a central vein located either in the groin, or above or below the clavicle.

64.    Central venous cannulation requires adequately trained and experienced medical personnel to locate and catheterize a central vein.

65.    Central venous cannulation is a complicated medical procedure which should only be performed by properly trained and experienced medical personnel with access to the necessary tools and equipment. If done incorrectly or imprecisely, the technique risks puncturing arteries, creating a  substantial risk that it will result in a torturous and botched execution.

66.    If central venous cannulation is not a viable alternative in a particular execution, upon information and belief, the Execution Team will attempt to perform a cutdown procedure.

67.    A cutdown procedure entails making a deep incision into the subject's skin to find a blood vessel, which is then cut open to allow for the insertion of a catheter.

68.    A cutdown procedure is an extremely painful, bloody, and complicated medical procedure that is rarely used by modern medical professionals.

69.     Because cutdowns are so painful and invasive, they are typically performed on a subject who is under deep sedation, not local anesthetic.

70.     Even on a sedated subject, a cutdown procedure requires greater skill than either intravenous access or central venous cannulation. Because it is so rarely used by modern medical professionals, most medical professionals have never been trained and do not possess the requisite skill to adequately perform a cutdown.

**D.     Mr. Nance's Prescription Usage of Gabapentin.**

71.     Mr. Nance also suffers from chronic back pain.

72.     Since April 2016, Mr. Nance has been administered the drug gabapentin to treat his back pain.

73.     In April 2019, his dosage increased from 800 mg, three times per day, to 900 mg, three times per day. The dosage recently increased to 1100 mg, three times per day.

74.     Prolonged gabapentin use alters a person's brain chemistry and makes the person's brain less responsive, or even unresponsive, to other drugs, including pentobarbital.

75.    As a result of his prolonged gabapentin use, pentobarbital's capacity to render Mr. Nance unconscious and insensate during his execution will be diminished.

76.    At the same time, pentobarbital's effects on Mr. Nance's respiratory system will remain undiminished, meaning that Mr. Nance will feel the painful effects of the severe respiratory distress and organ failure that occur when pentobarbital is administered for a lethal injection.

77.    In addition, if the lethal injection induces pulmonary edema in Mr. Nance, as it has in at least seven (7) recent executions, Mr. Nance will feel his lungs filling with fluid, also resulting in the excruciating sensation of suffocating to death.

## CLAIM FOR RELIEF

**Defendants' Lethal Injection Protocol as Applied to Mr. Nance Violates His Eighth and Fourteenth Amendment Rights Under the United States Constitution.**

78.    The Eighth Amendment's prohibition against cruel and unusual punishment forbids methods of execution that involve unnecessary or wanton infliction of pain and present a substantial risk of significant harm.

79.    Defendants' current Protocol calls for lethal injection, which requires the insertion of intravenous catheters to administer the lethal drug.

80.     Mr. Nance's difficult-to-locate and heavily scarred, tortuous, irregular, and thin veins create a substantial risk of unnecessary and excruciating pain during efforts to obtain IV access and the administration of the lethal drug.

81.     Because Mr. Nance has severely compromised veins, it will be exceedingly difficult, if not impossible, for the IV Team to establish reliable, sustained intravenous access during the lethal injection procedure.

82.     If the IV Team attempts to insert an intravenous catheter into Mr. Nance's veins, they will very likely be unsuccessful and will, in the process, cause excruciating pain to Mr. Nance by repeatedly attempting to insert needles into unidentifiable and/or inaccessible veins.

83.     Even if the IV Team eventually does obtain intravenous access on Mr. Nance to administer the lethal drug, Mr. Nance's vein will likely lose structural integrity during the execution, leading to extravasation—the leakage of pentobarbital into the soft tissue surrounding the vein.

84.     Extravasation can have two severely painful results: (1) an inadequate and/or inconsistent drug delivery, which can cause a prolonged and only partially anesthetized execution; and (2) an intense burning of the tissues surrounding the vein.

85.     Assuming the IV Team is even able to find and enter a vein, the risk of extravasation means that Mr. Nance will then be at substantial risk to experience even more intense pain as a result of a prolonged and only partially anesthetized execution as his soft tissue burns within his body.

86.     Given the fact that the Injection Team will not be in the same room as Mr. Nance, it is unlikely to even be aware of the fact that extravasation has occurred.

87.     In addition, the risk of inconsistent and incomplete delivery of the drug to Mr. Nance because it is being administered through many feet of IV tubing increases the risk of a prolonged and/or only partially anesthetized execution.

88.     Poor or reduced quality, potency, purity or stability of the compounded pentobarbital also increases the risk that Mr. Nance will suffer a prolonged and/or only partially anesthetized execution.

89.     Any factor that results in a prolonged and/or only partially anesthetized execution will cause Mr. Nance to experience excruciating pain as the pentobarbital suppresses his respiratory functioning and causes his organs to fail.

90.     Furthermore, should the attempts to provide intravenous access fail, the alternatives are central venous cannulation or a cutdown. Members of the

execution team lack the professional skills, training, and/or necessary equipment to safely and humanely perform these procedures.

91.     Regardless of the cause, if the drug is inconsistently or inadequately delivered, or if there is a problem with its quality, potency, purity or stability, Mr. Nance may survive the admissions of the intended lethal dose. If Mr. Nance shows visible signs of life, according to the Protocol, the whole excruciating process will be repeated.

92.     Alternatively, a problem with the quality, potency, purity or stability of the drug, or failed or inadequate drug delivery could result in brain damage to Mr. Nance, rather than death.

93.     Even if the Defendants' lethal injection drug, pentobarbital, could be humanely and effectively administered to Mr. Nance, his altered brain chemistry resulting from his prescribed use of gabapentin will diminish the efficacy of the drug, which will result in it taking a longer period of time to take effect.  The risk of inadequate or inconsistent drug delivery resulting from the many feet of IV tubing and problems with the quality, potency, purity or stability of the drug significantly exacerbate this problem.

94.     As a result, Mr. Nance is at a substantial risk of remaining conscious while the pentobarbital suppresses his respiratory system and causes his organs to fail.

95.     Central venous cannulation or a cutdown procedure while Mr. Nance is conscious would further subject Mr. Nance to excruciating  pain.

96.     The pentobarbital injection may also induce pulmonary edema, as is common in Georgia executions. If this occurs, and Mr. Nance is not fully insensate, he will feel his lungs filling with fluid, also resulting in the excruciating sensation of suffocating to death.

97.     Individually or in combination, Mr. Nance's medical conditions (including his gabapentin treatment for chronic back pain); the unknown and untested quality, potency, purity and stability of the compounded pentobarbital; the execution team's inadequate skill, experience, and training; and other problematic elements of the Protocol as applied to Mr. Nance (i.e., long tubing, remote injection, alternatives to intravenous access) are sure or very likely to cause Mr. Nance needless pain and suffering, and put him in imminent danger.

98.     There is a substantial and objectively intolerable risk that Mr. Nance will experience severe pain and suffering if DOC and the Prison proceed to execute

him by lethal injection under the Protocols, in violation of his Eighth Amendment rights.

99.     These risks to Mr. Nance are so substantial and imminent that, if he is executed by lethal injection under the Protocols, the Defendants cannot claim they are subjectively blameless for the purposes of the Eighth Amendment.

100.    There is an alternative method of execution that is feasible and readily implemented which will significantly reduce or eliminate the substantial risk of severe pain to Mr. Nance. That alternative method is execution by a firing squad.

101.    Execution by use of a firing squad is a known and available alternative method. The Supreme Court has held that the firing squad is a constitutionally permissible form of execution.

102.    Since 1976, Utah has carried out three executions by firing squad— most recently on July 18, 2010.[1]

103.    Protocols for execution by firing squad are known and available. Utah's technical manual, specifying the state's execution protocol in great detail, is publicly accessible. *See* Technical Manual of Utah Department of Corrections; *see*

---

[1] Kirk Johnson, *Double Murderer Executed by Firing Squad in Utah*, N.Y. TIMES, June 19, 2010, at A12.

*also Utah Brings Back the Firing Squad, So How Does It Work?*, ASSOCIATED
PRESS, Mar. 24, 2015.

104.   Georgia could easily identify qualified personnel to carry out an
execution by firing squad. Furthermore, Georgia already has a sufficient stockpile
or can readily obtain both the weapons and ammunition necessary to carry out an
execution.

105.   Moreover, execution by firing squad is both swift and virtually
painless. If performed properly, the use of a firing squad will eliminate the
substantial risk of severe pain that Defendants' current execution Protocol presents
to Mr. Nance. Evidence and recent experience strongly suggest that the firing
squad is significantly more reliable than lethal injection.

106.   Accordingly, an execution by firing squad is a known and available
alternative method of execution that presents a substantially lower risk of pain and
suffering to Mr. Nance than Defendants' Protocols for lethal injection.

107.   Faced with this viable alternative, if the Defendants refuse to adopt
Mr. Nance's proposed alternative, without a legitimate penological justification for
adhering to its current method of execution, then it should be viewed as a choice
by the Defendants to intensify the sentence of death with a cruel "superaddition" of

terror and pain, in violation of the Eighth Amendment of the United States Constitution.

## EXHAUSTION OF ADMINISTRATION REMEDIES

108.    On November 26, 2019, Mr. Nance filed a grievance with DOC concerning his planned execution by lethal injection under DOC's Statewide Grievance Procedure, Policy No. 227.02.

109.    Mr. Nance's grievance is pending, but Mr. Nance's complaints are "non-grievable" under DOC's published grievance policy.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Michael Nance respectfully requests that this Court:

1. Enter a declaratory judgment under 42 U.S.C. § 1983 that Defendants' plans to execute Mr. Nance by lethal injection violate Mr. Nance's rights under the Eighth and Fourteenth Amendments of the United States Constitution;

2. Grant injunctive relief to enjoin the Defendants from proceeding with the execution of Mr. Nance by a lethal injection under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution; and,

3.   Issue any further relief as it seems just and proper.


Dated:  January 8, 2020                    Respectfully submitted,

                                           **BAKER & HOSTETLER LLP**


                                           */s/ John P. Hutchins*
                                           **John P. Hutchins**
                                           Georgia Bar No. 380692
                                           jhutchins@bakerlaw.com
                                           **Alixandria L. Davis**
                                           Georgia Bar No. 695370
                                           adavis@bakerlaw.com

                                           BAKER & HOSTETLER LLP
                                           1170 Peachtree Street, Suite 2400
                                           Atlanta, GA 30309-7676
                                           Telephone:  404.459.0050
                                           Facsimile:  404.459.5734


                                           **Vanessa Carroll**
                                           Georgia Bar No. 993425
                                           vanessa.carroll@garesource.org
                                           **Cory Isaacson**
                                           Georgia Bar No. 983797
                                           cory.isaacson@garesource.org

                                           GEORGIA RESCOURCE CENTER
                                           303 Elizabeth St. N.E.
                                           Atlanta, GA 30307
                                           Telephone: 404.222.9202
                                           Facsimile: 404.222.9212


                                           *Attorneys for Plaintiff Michael Nance*