# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

MICHAEL NANCE,                     )
                                   )
      Plaintiff,                    )
                                   )
v.                                 )
                                   )
TIMOTHY C. WARD, Commissioner,     )
Georgia Department of Corrections, )
                                   )
BENJAMIN FORD, Warden,             )
Georgia Diagnostic and Classification )
Prison,                            )
      Defendants.                   )
_____  )

CIVIL ACTION NO.:
1:20-cv-00107-JPB

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**BAKER & HOSTETLER LLP**

**John P. Hutchins**
Georgia Bar No. 380692
jhutchins@bakerlaw.com
**Alixandria L. Davis**
Georgia Bar No. 695370
adavis@bakerlaw.com
1170 Peachtree Street, Suite 2400
Atlanta, GA 30309-7676
Telephone:  404.459.0050
Facsimile:  404.459.5734

**GEORGIA RESOURCE CENTER**

**Anna Arceneaux**
Georgia Bar No. 401554
anna.arceneaux@garesource.org
**Vanessa Carroll**
Georgia Bar No. 993425
vanessa.carroll@garesource.org
**Cory Isaacson**
Georgia Bar No. 983797
cory.isaacson@garesource.org
303 Elizabeth St. N.E.
Atlanta, GA 30307
Telephone: 404.222.9202
Facsimile: 404.222.9212

*Attorneys For Plaintiff Michael Nance*

Defendants' Motion to Dismiss offers incorrect time periods for determination of the statute of limitations, ignores the facts clearly alleged in the Complaint or attempts to re-cast them as "conclusory," and makes arguments regarding exhaustion of administrative remedies that have previously been rejected. When the appropriate standard is applied to the facts alleged in the Complaint, it is clear that Mr. Nance's claims are not time-barred. The <u>factual</u> allegations in the Complaint, when viewed in a light most favorable to Mr. Nance, state plausible claims for relief. And Mr. Nance has exhausted his available administrative remedies. Defendants' motion should be denied.

## I.  LEGAL STANDARD

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Indeed, "[a] complaint may survive a motion to dismiss for failure to state a claim . . . even if it is 'improbable' that a plaintiff would be able to prove those facts [and] even if the possibility of recovery is extremely 'remote and unlikely.'" *Swipe Innovations, LLC v. NCR Corp.*, No. 1:13-CV-2219-TWT, 2013 WL 6080439, at *1 (N.D. Ga. Nov. 18, 2013)(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Moreover, "[i]n ruling on a motion to dismiss under Rule 12(b)(6), a court must construe a complaint in the light most favorable to the plaintiff, not the other way around." *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 977 (11th Cir. 2015). Generally, a valid complaint simply requires notice pleading. *Swipe Innovations*,

2013 WL 6080439 at *1. And under such a standard, "the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests." *Id.* (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Mr. Nance's complaint provides Defendants more than sufficient notice of his claims. Defendants' motion should be denied.

## II. ARGUMENT AND AUTHORITY

### A.   Statute of Limitations

1.   Mr. Nance does not assert a facial challenge to Georgia's method of execution and there is no statute of limitations on proposing an alternative method of execution under *Baze-Glossip*.

Defendants assert that "Nance's general 'method-of-execution' claims are time-barred" (Doc. 18 at 7). But this is attacking a straw man. Mr. Nance does not assert a general (or facial) challenge. His sole claim is that Defendants' Protocol, *as applied to him,* violates his constitutional rights. In order to discuss why the Protocol is unconstitutional as applied to him, Mr. Nance must explain Georgia's method of execution. But all facts asserted in Mr. Nance's Complaint regarding the Protocol are in support of his "as applied" challenge. The court should disregard Defendants' arguments that a facial challenge is time-barred.

Defendants' second straw man fallacy is that "Nance's firing squad claims are also time-barred." (Doc. 18 at 12.) Defendants set up Mr. Nance's reference to Utah's firing squad protocol as a statute of limitations issue, stating that it accrued at the time of Utah's

most recent execution by firing squad. (Doc. 18 at 13). But Mr. Nance proposes firing squad as an alternative method of execution, required by *Baze v. Rees*, 553 U.S. 35, 52 (2008) and *Glossip v. Gross*, ___ U.S. ___,135 S. Ct. 2726, 2737 (2015). The firing squad is not the underlying cause of action, subject to a statute of limitations. *Baze-Glossip* does not impose a statute of limitations on the alternative method itself. *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 873-74 (11th Cir. 2017) (assessing whether plaintiff's method of execution claim is time-barred, separate and apart from its assessment of whether plaintiff pled a potential alternative method of execution).

In support of its argument that the alternative method is time-barred, Defendants cite *Ledford v. Comm'r, Georgia Dep't of Corr.*, 856 F.3d 1312 (11th Cir. 2017). In *Ledford*, the prisoner pled both a facial method of execution challenge and an "as applied" challenge to Georgia's Protocol. The court held that Ledford's facial challenge accrued in October 2001, when Georgia adopted lethal injection as its method of execution, and that his 2017 complaint was therefore untimely. *Id.* at 1315-16. Defendants interpret the court's finding that the firing squad alternative was asserted "well beyond the two-year statute of limitations," *id.* at 1319, as meaning that "execution by firing squad is [sic] an alternative method of execution is [] time-barred." (*Id.*) But this single sentence is in reference to the court's holding that the prisoner's *facial method of execution claim* is time-barred, not that firing squad as a proposed alternative is time-barred. At no point does the court engage in an assessment of when the statute of limitations regarding a

firing squad alternative accrued. To adopt Defendants' reading of *Ledford* means that any Georgia plaintiff who wants to propose firing squad as an alternative method must have done it by July 18, 2012, two years after Utah's most recent firing squad execution. That is not *Ledford*'s holding. Mr. Nance's proposal of firing squad is not time-barred.

    2. "As applied" challenge to Lethal Injection Protocol is not time-barred.

    The statute of limitations for Mr. Nance's "as applied" challenge is two years from the date the limitations period began to run. Defendants acknowledge that the statute of limitations begins to run when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." (Doc. 18 at 10, citing *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008)). As an affirmative defense, "dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Boyd*, 856 F.3d at 872.

    Mr. Nance's "as applied" challenge is based on two facts: (1) Mr. Nance's severely compromised veins; and (2) Mr. Nance's prolonged and increasing usage of gabapentin. How these issues would impact an execution by lethal injection became apparent to Mr. Nance in 2019.

    With regard to Mr. Nance's compromised veins, the statute of limitations began to run on or around May 2019 at the earliest, when a medical technician at the Prison told Mr. Nance that if he were to be executed by lethal injection, the execution team would have

to cut his neck to carry out the execution because they would not otherwise be able to obtain sustained intravenous access. (Compl. ¶ 51.) The Complaint alleges that this was a reference either to a procedure whereby the execution team would obtain sustained venous access through central venous cannulation or a surgical procedure known as a cutdown. (Compl. ¶ 52.) That Mr. Nance has no medical training is undisputed. Before the technician's statement, it could not have been apparent to Mr. Nance that his execution would require either procedure. An anesthesiologist confirmed the technician's assessment in October 2019, after physically examining Mr. Nance's veins. (Compl. ¶ 53.) As a result, the facts giving rise to Mr. Nance's cause of action only became apparent in 2019. As noted above, the standard under *McNair* for determining when the statute of limitations begins to run is when the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights. 515 F.3d at 1173. When Mr. Nance became aware of the low quality of his veins is irrelevant. What is relevant is when it was apparent or should have become apparent to him that it would have an impact on his execution.

Likewise, contrary to Defendants' argument, the date that Mr. Nance first began to use gabapentin is not the relevant date with regard to the statute of limitations on that claim. When Mr. Nance became aware, or should have become aware, that his prolonged use and increasing dosages, would affect the efficacy of pentobarbital and impact his execution is the relevant issue. This interaction between gabapentin and pentobarbital

5

would certainly not be obvious to a lay person. Defendants have not suggested any reason why Mr. Nance should have been aware of that risk.

In order to succeed on their affirmative defense of statute of limitations, Defendants need evidence to prove that Mr. Nance knew or should have known about the impact of his compromised veins and his prolonged and increasing use of gabapentin on his execution. At the 12(b)(6) stage, based on the face of the Complaint, there is no reason why the court should consider the claims untimely.

## B. Plausible Claim for Relief

Defendants' Brief attempts to parse Mr. Nance's claim into several different distinct claims. However, Mr. Nance's claim, as summarized in Paragraph 97 of the Complaint, is that even if one specific problem with Georgia's Protocol does not, for whatever reason, give rise to a plausible claim for relief, the combination of all of the issues raised by Mr. Nance's Complaint – his unique medical conditions (including his veins and prolonged and increasing gabapentin use); the unknown and untested quality, potency, purity and stability of the compounded pentobarbital; the execution team's inadequate skill, experience, and training; and other problematic elements of the Protocol (i.e., long tubing, remote injection, alternatives to intravenous access) – are "sure or very likely to cause serious illness or needless suffering, and give rise to sufficiently imminent dangers" as is required by *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F. 3d 1275, 1283 (11th Cir. 2015).

Defendants' essentially argue that Mr. Nance must prove his case at the pleading stage. They dismiss many of Mr. Nance's detailed factual allegations as mere "legal conclusions" or "speculation." The question is, however, whether Mr. Nance has asserted facts that, if assumed to be true, set forth a plausible claim for relief. Defendants' attempt to re-cast factual allegations as legal conclusions is insufficient.

1. <u>"As applied" challenge concerning Nance's veins</u>.

Mr. Nance's Complaint includes many facts to support the overall factual allegation that his "veins are extremely difficult to locate through visual examination, and those veins that are visible are severely compromised and unsuitable for sustained intravenous access." (Compl. at 2; see also Compl. at ¶¶ 48, 54, 56, 80, 81, 82.) The State's brief does not take issue with these allegations. Rather, it argues only that "Georgia's lethal injection protocol accounts for the possibility of an inmate's veins being compromised," specifically by access via "central venous cannulation or other medically approved alternative." (Doc. 18 at 17-18, quoting Georgia's Lethal Injection Procedures ("Protocol") at 4). Defendants argue that the availability of this alternative method undercuts all of Mr. Nance's allegations supporting his conclusion that his compromised veins create a condition that will very likely cause "'serious illness and needless suffering, and give rise to sufficient imminent dangers.'" (Doc. 18 at 18, quoting *Gissendaner*, 779 F3d at 1283.) They argue that Mr. Nance is "simply speculating about a contingency that is accounted for in Georgia's protocol." *Id.*

But Mr. Nance's Complaint alleges not only that his veins are compromised, but also facts about the scenarios that are very likely to play out during his execution, before central venous cannulation is even attempted. First, he alleges:

- In May 2019, a prison medical technician told Mr. Nance that the execution team would have to perform central venous cannulation or a cutdown procedure during his execution because they would not otherwise be able to obtain intravenous access (Compl. ¶¶51-52.)
- Subsequently, Mr. Nance had a physical examination by an anesthesiologist, and he concluded that there are no discernible veins on visual examination in Mr. Nance's forearms or left or right antecubital fossa and that Mr. Nance's lower extremities also lack visible and palpable veins. (Compl. ¶¶53-54.)

The Protocol specifies, or at least implies, and the medical technician with whom Mr. Nance spoke in May 2019 confirmed, that the execution team will attempt to obtain normal intravenous access before resorting to alternatives. As a result, and as Mr. Nance has alleged,

- The IV team will likely make multiple painful needle insertions and blind attempts to locate a suitable vein. (Compl. ¶55.)
- Any veins that are discernible in Mr. Nance are heavily scarred, tortuous, and have thin walls. (Compl. ¶56.)
- Thus, even if the IV Team can obtain intravenous access, insertion of a catheter will be extremely difficult and presents a substantial risk that the vein will lose structural integrity, causing the injected pentobarbital to leak into the surrounding tissue, known as extravasation, which is intensely painful. (Compl. ¶¶57-59.)
- If that happens, it would also lead to incomplete and inconsistent drug delivery, resulting in a prolonged and only partially anesthetized execution wherein Mr. Nance would experience the excruciating feeling of suffocating to death. (Compl. ¶60.)
- In addition, the fact that, under the Protocol, the Injection Team is not in the same room and administers the pentobarbital through many feet of IV tubing significantly lessens the probability that the Injection Team would even be aware

8

of a blown vein when it occurs, making it very unlikely that they could recognize the extravasation and take timely, appropriate action. (Compl. ¶61.)

Thus, Mr. Nance has alleged that impermissible and severe pain and suffering is likely to occur before central venous cannulation is attempted. Astonishingly, Defendants argue that Mr. Nance has offered no facts regarding "how this alleged medical condition adversely affects intravenous access" or "why it is plausible that central venous cannulation would actually be required at this execution." (Doc. 18 at 19.) But the likely results of Mr. Nance's medical condition are exactly what Paragraphs 55-61 contain. These are allegations of facts regarding what is sure or very likely to occur, before Defendants ever resort to their "contingency plan" for central venous cannulation or a cutdown procedure.[1]

Defendants also complain that Mr. Nance has failed to allege facts concerning the cause of his poor veins or how long he has been aware of the problems. But these facts are not germane to whether Mr. Nance has stated a plausible claim for relief. They are red herrings that Defendants raise regarding facts not alleged. The issue for this court to decide under Rule 12(b)(6) is whether the facts regarding Mr. Nance's veins and the likely results of the Protocol as applied to him, if assumed to be true, state a plausible claim for relief. The answer is plainly, "Yes." Mr. Nance's allegations include facts that,

---

[1] Mr. Nance has also alleged that Defendants' "contingencies" will also violate the Eight and Fourteenth Amendments. (Compl. ¶¶ 62-70, 90.)

if true, create a risk that is very likely to cause serious illness or needless suffering, and give rise to imminent dangers. *See Gissendaner*, 779 F.3d at 1283.

2. "As applied" challenge concerning gabapentin and pentobarbital.

Defendants give Mr. Nance's claims regarding gabapentin short shrift, arguing that "Nance alleges no facts whatsoever that his use of gabapentin will somehow interact with the lethal dose of pentobarbital he will be administered during execution." (Doc. 18 at 20.) But the Complaint pleads specific <u>facts</u> regarding his prolonged and increasing gabapentin use (Compl. ¶¶72-73.), and further alleges the following <u>facts</u> regarding the interaction of gabapentin and pentobarbital:

> Prolonged gabapentin exposure alters a person's brain chemistry and makes the person's brain less responsive, or even unresponsive, to other drugs, including pentobarbital. As a result of Mr. Nance's prolonged gabapentin use, pentobarbital's capacity to render him unconscious and insensate during his execution will be diminished. At the same time, pentobarbital's effects on Mr. Nance's respiratory system will remain undiminished, meaning that he will feel the painful effects of the severe respiratory distress and organ failure that occur when pentobarbital is administered for a lethal injection. And if the lethal injection induces pulmonary edema, as it has in at least 7 recent executions, Mr. Nance will feel his lungs filling with fluid, also resulting in the excruciating sensation of suffocating to death.

(Compl. ¶74-77.) These are alleged facts, not "mere conclusory statements" or "rank speculation." Defendants may not agree with these alleged facts. They may seek to offer expert testimony at trial to refute them. But they are still alleged facts. The plausibility standard under *Ashcroft v. Iqbal*, 556 U.S.662 (2009) does not require Mr. Nance to prove his allegations at the pleading stage. These allegations are not simply "labels and

conclusions," or "a formulaic recitation of elements of a cause of action," as the Supreme

Court in *Bell Atlantic Corp. v. Twombly*, 55 U.S. 544, 555 (2007) warned "will not do."

Rather, they are subject to and capable of proof at trial. At this stage, if this Court

assumes they are true, they form a portion of Mr. Nance's plausible claim for relief.

Mr. Nance's allegations are not "simply speculating that a medication will somehow

adversely interact with the efficacy of pentobarbital at the time of his execution." (Doc.

18 at 20-21). Paragraphs 74-77 state with specificity how gabapentin impacts the efficacy

of pentobarbital (i.e., altered brain chemistry, making brain less responsive); the

consequence of the reduced efficacy (i.e., diminishing pentobarbital's capacity to render

Mr. Nance unconscious); and, the enhanced pain and suffering that he will endure as a

result (i.e., consciously experiencing severe respiratory distress, pulmonary edema and

organ failure).

Remarkably, Defendants state, "Even assuming everything in Nance's complaint

concerning gabapentin was true, he has not stated a plausible claim for relief, because he

has not plausibly alleged that the lethal injection protocol, as applied to him, creates a

substantial risk of harm." (Doc. 18 at 21). However, Paragraph 89 states: "Any factor that

results in a prolonged and/or only partially anesthetized execution will cause Mr. Nance

to experience excruciating pain as the pentobarbital suppresses his respiratory functioning

and causes his organs to fail." Likewise, Paragraph 94 states, "Mr. Nance is at a

substantial risk of remaining conscious while the pentobarbital suppresses his respiratory

system and causes his organs to fail." And Paragraph 97 makes clear that individually or in combination, Mr. Nance's medical conditions (including his prolonged and increased gabapentin use), combined with the elements of the Protocol complained of, are sure or very likely to cause Mr. Nance needless pain and suffering and put him in imminent danger. Together, all of Mr. Nance's allegations sufficiently allege that Georgia's lethal injection Protocol, as applied to him, creates a substantial risk of serious harm.

3.  "As applied" challenge concerning firing squad.

First, Defendants rely principally on *Ledford*, 856 F.3d at 1318, as support for their argument that Mr. Nance's allegations that firing squad is a feasibly and readily implemented alternative method of execution are insufficient to withstand their motion. But the decision in *Ledford* is inapplicable to this court's consideration of Defendants' motion. *Ledford* was decided in a wholly different posture from this case. Mr. Ledford filed a § 1983 case "a mere five days before his execution," 856 F. 3d at 1314, and sought a temporary restraining order – i.e., a stay of execution. As the *Ledford* court noted, the standard to be applied in that circumstance required: "(1) a substantial likelihood of success on the merits; (2) that the [stay] is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the [stay] would cause the other litigant; and (4) that the [stay] would not be adverse to the public interest." *Id.* at 1315, citing *Gissendaner,* 779 F.3d at 1280 (quoting *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F3d. 1260, 1263 (11th Cir. 2014)).

That is <u>not</u> the standard to be applied to Defendants' motion. As set forth above, Mr. Nance's Complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a plausible claim for relief. A complaint may survive a motion to dismiss for failure to state a claim even if it is improbable that a plaintiff would be able to prove those facts [and] even if the possibility of recovery is extremely remote and unlikely. At this stage, the court must construe the Complaint in the light most favorable to Mr. Nance, not the other way around. (Section III, *supra*.)

The district court in *Ledford* dismissed the complaint because Mr. Ledford could not show a likelihood of success on the merits. "That alone doom[ed] his TRO requests." (*Ledford v. Dozier,* Case No. 1:17-cv-1705, slip op. at 16 (N.D. Ga. May 12, 2017)). Given the timing of Mr. Ledford's complaint, the request for a stay, and the court's ruling that his TRO request was doomed, the district court dismissed the complaint, essentially as moot. Mr. Nance's Complaint, filed (as the Defendants have previously noted) well before an execution warrant has even been issued, is in a different posture. Thus, *Ledford* is not dispositive here.

Applying the applicable standard under 12(b)(6), Mr. Nance's Complaint contains sufficient factual allegations regarding a firing squad as a proposed alternative method of execution that, if assumed true, form a necessary part of his plausible claim for relief, including the following:

- Execution by firing squad is a known and available alternative method. (Compl., ¶101.)

13

- The Supreme Court has held that the firing squad is a constitutionally permissible form of execution. (*Id.*)
- Since 1976, Utah has carried out three executions by firing squad—most recently on July 18, 2010. (Compl., ¶102.)
- Protocols for execution by firing squad are known and available. Utah's technical manual, specifying the state's execution protocol in great detail, is publicly accessible. (Compl., ¶103.)
- Georgia could easily identify qualified personnel to carry out an execution by firing squad. (Compl., ¶104.)
- Georgia already has a sufficient stockpile or can readily obtain both the weapons and ammunition necessary to carry out an execution. (*Id.*)
- Execution by firing squad is both swift and virtually painless. (Compl., ¶ 105.)

Defendants erroneously contend that the Complaint "provides no facts concerning Utah's firing squad execution protocol," (Doc. 18 at 22), despite Paragraph 103, which specifically cites Utah's publicly accessible technical manual and an Associated Press news article which further explains how Utah's firing squad method works. Defendants also argue that the Complaint "provides no facts concerning the manner in which Georgia could feasibly and readily implement such an alternative method of execution." (*Id.*) To the contrary, the Complaint not only includes the citation to Utah's technical manual, but it also alleges in Paragraph 104 that Georgia has the weaponry and ammunition necessary to carry out an execution. The court must assume that these allegations are true and, no doubt, they are. In fact, under Federal Rule of Evidence 201(b), this court could even take judicial notice of these facts. They are not subject to reasonable dispute because they (1) are generally known within the trial court's territorial jurisdiction; or (2) can be

14

accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

Regarding the further allegation in Paragraph 104 that Georgia could easily find qualified personnel to carry out an execution by firing squad, Defendants label it "speculation." The sources cited by Mr. Nance very plainly explain that the firing squad method includes five anonymous shooters, chosen from a pool of volunteer officers, set up about 25 feet from the prisoner, seated in a chair, with .30 caliber Winchester rifles pointing through slots in a wall. It is not seriously debatable that Defendants could find five volunteer law enforcement officers in Georgia who would be willing and able to shoot a Death Row inmate from 25 feet away. In the Associated Press article cited in Paragraph 103 of the Complaint, the Utah state representative who sponsored the legislation authorizing execution by firing squad is quoted as having said that there are always more volunteers than spots on the squad. It is at least plausible that Georgia would have a similar supply of willing participants. In any event, at the 12(b)(6) stage, the court must assume that Mr. Nance could prove these facts if given the opportunity.

Defendants likewise label the allegation in Paragraph 105 that "[e]xecution by firing squad is both swift and virtually painless" as conclusory speculation. Yet, again, the Associated Press article cited in Paragraph 103 of the Complaint reports that, "[a]ssuming they hit their target, the heart ruptures and the prisoner dies quickly from blood loss. In 2010, Ronnie Lee Gardner (the last person executed by firing squad) was declared dead

15

two minutes after he was shot." When compared to the allegations of Mr. Nance's Complaint that he likely would suffer a prolonged, bloody and excruciatingly painful death by lethal injection, the allegations contained in Paragraph 105, including the assertion that death by firing squad would substantially lower the risk of pain and suffering, are not "'bare-bones legal conclusions unsupported by facts,'" as the Defendants have argued (Doc. 18 at 23, borrowing language from the district court's opinion quoted in *Boyd*, 856 F.3d at 863).[2]

In the event that this court does not agree with Defendants that Mr. Nance's allegations regarding firing squad lack the requisite specificity to survive a 12(b)(6) motion, Defendants assert a "back up" argument. Essentially, Defendants argue that, because lethal injection is the only form of execution currently authorized by the Georgia legislature, and regarding which the Georgia Department of Corrections has developed a protocol, execution by firing squad "would be illegal in Georgia" and, therefore, there is no way that Mr. Nance can meet the *Baze-Glossip* requirements of proposing a "feasible and readily implemented" alternative method of execution. (Doc. 18 at 23-26.) However, the law does not support such an absurd result.

---

[2] The court should also note that similar allegations regarding an alternative method of execution were made in *Martin v. Dozier*, No. 1:18cv04617, slip op. at 16 (N.D. Ga. Nov. 21, 2019) (attached hereto as Tab A).  The *Martin* court determined that the allegations were sufficient to withstand a 12(b)(6) challenge. *Id.* at 16, 21.

The well-known *Baze-Glossip* test requires that a prisoner challenging a method of execution "must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 139 S.Ct. 1112, 1125 (2019). This standard governs "all Eighth Amendment method-of-execution claims." *Id.* (citing *Glossip*, 135 S.Ct. at 2731). Under *Bucklew*, "[t] his means the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out "relatively easily and reasonably quickly." *Id.* at 1129 (citing *McGehee* v. *Hutchinson*, 854 F.3d 488, 493 (8th Cir. 2017); *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840. F.3d 1268, 1300 (11th Cir. 2016)). Mr. Nance's allegations, including the citations to the publicly available resources, certainly meets this test. In *Bucklew*, the Court found that "Mr. Bucklew's bare-bones proposal falls well short of that standard." *Id.* The Court explained:

> [Mr. Bucklew] has presented no evidence on essential questions like how nitrogen gas should be administered (using a gas chamber, a tent, a hood, a mask, or some other delivery device); in what concentration (pure nitrogen or some mixture of gases); how quickly and for how long it should be introduced; or how the State might ensure the safety of the execution team, including protecting them against the risk of gas leaks. Instead of presenting the State with a readily implemented alternative method, Mr. Bucklew (and the principal dissent) point to reports from correctional authorities in other States indicating that additional study is needed to develop a protocol for execution by nitrogen

> hypoxia. [cit. omitted] . . . That is a proposal for more research, not the readily
> implemented alternative that *Baze* and *Glossip* require.[3]

By contrast, Mr. Nance's Complaint points to publicly available resources, including a

protocol already developed by Utah, which addresses all of the types of questions that the

*Bucklew* Court found needed to be answered in order for an alternative method to be

considered "feasible and readily implemented."

Notably, the *Bucklew* Court did not fault Mr. Bucklew for proposing an

alternative method that had not been approved by the Missouri legislature. "An

inmate seeking to identify an alternative method of execution is not limited to

choosing among those presently authorized by a particular State's law. Missouri

itself seemed to acknowledge as much at oral argument."  *Bucklew*, 139 S.Ct. at

1128; Oral Argument at 46:20, *Bucklew v. Precythe*, 139 S.Ct. 1112 (2019) (No.

17-8151). So, for example, a prisoner may point to a well-established protocol in

another State as a potentially viable option." *Bucklew v. Precythe*, 139 S. Ct. at

1128. It stands to reason, as the Bucklew Court continued, "[T]he Eighth

Amendment is the supreme law of the land, and the comparative assessment it

requires can't be controlled by the State's choice of which methods to authorize in

its statutes." *Id.* at 1128-29. Defendants' argument is essentially the same as Judge

---

[3] It merits noting that Bucklew did not lose at the motion to dismiss stage. He lost
on summary judgment, after "extensive discovery" on the nitrogen gas alternative.
*Bucklew*, 139 S. Ct. at 1121.

Wilson's characterization of the majority opinion in his dissent in *Arthur*, "[I]f a state legislatively opposes an execution alternative, then the alternative is not feasible and readily implemented and method of execution relief is foreclosed." *Arthur*, 840 F.3d at (Wilson, J., dissenting). But the majority in *Arthur* went out of its way to explain that this conclusion "is not at all what we have said." *Id.* at 1319. Instead, the majority explained that the crux of its opinion was that Mr. Arthur had not shown that Alabama's two authorized methods of execution were unconstitutional, and hence his alternative proposed method of execution, if accepted by the court, would amount to a veto of the Alabama legislature's choice of two constitutional methods. *Id.* But, the *Arthur* majority stated,

> "It seems clear that if a state's sole method of execution is deemed unconstitutional, while other methods remain constitutional (even if they are not authorized by the state statute), our inquiry into whether those other options are feasible and readily implemented would be a different one. . . . But that is not the case here."

*Id.* As the district court in the *Ledford* case explained, "[i]f the Court found that Georgia's pentobarbital injection, 'as applied' to gabapentin patients like Ledford, constituted cruel and unusual punishment, that 'different' analysis [referenced by the *Arthur* majority] arguably would apply." *Ledford*, No. 1:17-cv-1705, slip op. at 13-14). That is precisely the nature of Mr. Nance's claims. As applied to him, for all of the reasons stated in the Complaint, Georgia's Protocol is cruel and unusual punishment. Georgia's choice to take the narrow course of statutorily authorizing

only one method of execution – which as applied to Mr. Nance is unconstitutional

– does not mean that, constitutionally, other alternatives are not readily available.

## C.    Exhaustion of Remedies

Mr. Nance filed his grievance on November 26, 2019. (Doc. 18-2). Under the

Statewide Grievance Procedure (Doc. 19-1), Defendant Ford had forty days from the date

of the grievance - until January 5, 2020 - to deliver a decision to Mr. Nance. (Doc. 19-1 at

12). But, Ford did not reject the grievance until January 13, 2020, and then waited two

weeks to deliver the rejection to Mr. Nance, on January 27, 2020, just three days before

Defendants filed the instant motion.[4] (Doc. 18-3). Ford provided the following reason for

rejecting Mr. Nance's grievance:

> The Georgia Department of Corrections carries out all court ordered execution
> procedures in a manner which is entirely consistent with the provisions of the
> United States Constitution and the laws of the State of Georgia.

*Id.* Upon receipt of the rejection, Mr. Nance filed a central office appeal on January 30,

2020. Apparently, that appeal is still pending.

1.  <u>Administrative remedies were unavailable for Mr. Nance's method of execution
    claim; even so, he exhausted the remedies available.</u>

Defendants contend that Mr. Nance failed to exhaust his administrative remedies

because: 1) his original grievance "failed to raise the same condition of confinement

challenges" that he raised in his complaint; and 2) Mr. Nance has failed to appeal the

---

[4] Although GDC's grievance procedure allows the prison to take a one-time, ten-day
extension, GDC did not follow its own rules regarding such an extension.

prison's rejection of his original grievance. *Id.* at 26. Defendants are wrong on both counts. Their argument is also inapposite because this Court recently held that Georgia Department of Corrections' ("GDC") administrative remedies were "unavailable" to Mr. Nance in the first place. *See Martin v. Dozier*, No. 1:18cv04617, slip op. (N.D. Ga. Nov.21, 2019) (Tab A).

   a.  *Administrative Remedies Were Not "Available" to Mr. Nance.*

Exhaustion is an affirmative defense; Defendants therefore have the burden of proving that Mr. Nance has failed to exhaust his administrative remedies. *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). The Eleventh Circuit employs a two-step process for deciding motions to dismiss for failure to exhaust administrative remedies under the Prison Litigation Reform Act. The court first "looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true." *Id.* at 1082. If the plaintiff has sufficiently alleged proper exhaustion, "the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." *Id*. "Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available administrative remedies." *Id.* at 1083.

However, critical to the court's resolution of a defendant's exhaustion defense is an inquiry into whether the prison's administrative remedies were in fact "available" to the plaintiff. "[A] prisoner need exhaust only 'available' administrative remedies." *Ross v.*

21

*Blake*, 136 S.Ct. 1850, 1856 (2016). An administrative remedy is deemed "available" only if it is capable of offering "some relief" to the prisoner. *Booth v. Churner*, 532 U.S. 731, 738 (2001). As the Eleventh Circuit has explained, to be "'available' a remedy must be 'capable of use for the accomplishment of [its] purpose.'" *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting *Goebert v. Lee County*, 510 F.3d 1312, 1322-23 (11th Cir. 2007)). When an administrative procedure "operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates," that procedure is not "available" to the prisoner. *Ross*, 136 S.Ct. at 1859. The Supreme Court has therefore recently recognized a "textual exception to mandatory exhaustion" under the PLRA that "hinges on the 'availab[ility]' of administrative remedies . . . ." *Ross*, 136 S.Ct. at 1858. Under this exception, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738 (2001). "When the facts on the ground" demonstrate that the grievance procedure offers no potential for relief, "the inmate has no obligation to exhaust the remedy." *Ross*, 136 S.Ct. at 1859.

Examining GDC's prior handling of method-of-execution grievances, it is clear that GDC is "unable or consistently unwilling to provide any relief to aggrieved inmates," and that GDC's grievance procedure "operates as a simple dead end." *Ross*, 136 S.Ct. at 1859. GDC has never provided prisoners who file method-of-execution grievances with any form of relief, and most recently, GDC explicitly disclaimed any authority to even

entertain these grievances. *See* Tab A.[5] With no prospects for "some relief," Mr. Nance was not required to exhaust.

Indeed, recently this court in *Martin v. Dozier*, No. 1:18cv04617 (N.D. Ga.) rejected Defendants' exhaustion defense and invoked *Ross* after finding that "GDC officials 'decline ever to exercise [their authority]' and are 'consistently unwilling to provide any relief'" because "in every § 1983 action challenging Defendants' method of execution in this district, GDC officials have both denied the grievance and disclaimed any authority even to consider it." Tab A (Slip Op. at 8). This court concluded that administrative remedies were not available to Martin because "[GDC's] grievance procedure is the 'simple dead end' discussed in *Ross* where officials 'disclaim[] the capacity to consider those petitions.'" *Id.* at 9. This court should reach the same conclusion here.

This Court should also reject Defendants' exhaustion defense because they have clearly manipulated the grievance procedure to manufacture an exhaustion defense and thwart Mr. Nance's lawsuit. *See Robinson v. Superintendent, Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016) (a prison's "failure to timely respond to an inmate's properly filed grievance renders its remedies 'unavailable' under the PLRA"); s*ee also Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 996 (6th Cir. 2004); *Power v. Ennis*, 177 F.3d 393 (5th Cir. 1999); *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001). It is apparent from

---

[5] In *Martin*, GDC rejected the prisoner's grievance because "it contains matters over which the Department has no control" including "court decisions and sentences," which, under GDC policy, are "non-grievable issues." Tab A (Slip Op. at 7-8).

Defendants' pleadings and exhibits that GDC failed to comply with their own grievance policy, (Doc. 18-3), yet Defendants have offered no explanation for their delay in first deciding Mr. Nance's grievance, and more significantly, their two-week delay in delivering their decision to Mr. Nance. The two-week delay between Defendants' rejection of the grievance and their delivery of that rejection to Mr. Nance is particularly troubling in light of Defendants' January 30 deadline for filing their motion to dismiss. Had Defendants complied with their own procedures, Mr. Nance could have (and would have) promptly appealed the denial. But then Defendants' would have lost the chance to argue that Mr. Nance failed to appeal his grievance.

b. *Mr. Nance Has Exhausted His Administrative Remedies.*

Despite Defendants' manipulation of the grievance process, Mr. Nance has appealed GDC's denial of his grievance. Defendants' claim that Mr. Nance has failed to appeal is incorrect. Defendants' second exhaustion argument, that Mr. Nance "failed to raise the same condition of confinement challenges in his grievance that he now raises in this §1983 complaint" is also baseless. The text of Mr. Nance's grievance shows that he did put Defendants on notice of his "as applied" challenge to GDC's lethal injection procedure. Mr. Nance complained that "GDC's current execution protocol [] fails to accommodate the unsuitability of my veins for lethal injection, as well as my other specific medical conditions, which on their own and together, create a substantial and

24

unacceptable risk that my execution will violate my Eighth and Fourteenth Amendment rights." (Doc. 18-2).

Mr. Nance was not required to present his alternative method-of-execution, the firing squad, in his grievance. GDC's grievance procedure does not require prisoners to enumerate particular remedies.[6] More importantly, the PLRA requires a prisoner to exhaust a procedure, not a remedy. *Booth*, 532 U.S. at 739; s*ee also Strong v. David* 297 F.3d 646, 649-50 (7th Cir. 2002) ("[N]o administrative system may demand that the prisoner specify each remedy sought in litigation . . . .").[7] Accordingly, the absence of the firing squad from Mr. Nance's grievance has no bearing on the question of exhaustion.

## III.    Conclusion

For the reasons set forth above, Defendants' motion to dismiss should be denied.

---

[6] *See Jones v. Bock*, 549 U.S. 199, 218 (2007) ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements . . . that define the boundaries of proper exhaustion.").

[7] The district courts of Georgia have also followed this rule. *See Thomas v. Humphrey*, 2014 U.S. Dist. LEXIS 35855, *4 (M.D. Ga. Jan. 23, 2014); *Doe v. Wooten*, 2010 U.S. Dist. LEXIS 71651, *6 (N.D. Ga. July 16, 2010); *Hooks v. Rich*, 2006 U.S. Dist. LEXIS 12951, *18-*19 (Jan. 17, 2006).

Dated:  February 12, 2020

Respectfully submitted,

**BAKER & HOSTETLER LLP**

 */s/ John P. Hutchins*
**John P. Hutchins**
Georgia Bar No. 380692
jhutchins@bakerlaw.com
**Alixandria L. Davis**
Georgia Bar No. 695370
adavis@bakerlaw.com

1170 Peachtree Street, Suite 2400
Atlanta, GA 30309-7676
Telephone:  404.459.0050
Facsimile:  404.459.5734

**GEORGIA RESOURCE CENTER**
**Anna Arceneaux**
Georgia Bar No. 401554
anna.arceneaux@garesource.org
**Vanessa Carroll**
Georgia Bar No. 993425
vanessa.carroll@garesource.org
**Cory Isaacson**
Georgia Bar No. 983797
cory.isaacson@garesource.org

303 Elizabeth St. N.E.
Atlanta, GA 30307
Telephone: 404.222.9202
Facsimile: 404.222.9212

*Attorneys For Plaintiff Michael Nance*

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.l(D) of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court was computer-processed, double-spaced between lines, and used Times New Roman font of 14-point size.

*/s/ John P. Hutchins*
**John P. Hutchins**
Georgia Bar No. 380692
jhutchins@bakerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT has been electronically filed with the Clerk of Court using the CM/ECF system, which automatically sends electronic notifications to the attorneys of record and by electronic mail to the following:

> **Beth A. Burton**
> bburton@law.ga.gov
> **Clint C. Malcolm**
> cmalcolm@law.ga.gov
> **Sabrina D. Graham**
> sgraham@law.ga.gov

Date: February 12, 2020

*/s/ John P. Hutchins*
**John P. Hutchins**
Georgia Bar No. 380692
jhutchins@bakerlaw.com