UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL WADE NANCE,

     Plaintiff,

     v.

TIMOTHY C. WARD and
BENJAMIN FORD,

     Defendants.

CIVIL ACTION NO.

1:20-cv-0107-JPB

## ORDER

Before the Court is Defendants' Motion to Dismiss the Complaint ("Motion"). ECF No. 19. Having reviewed and considered Defendants' arguments, the Court finds as follows:

## I. Background

Plaintiff, a prisoner currently under a sentence of death by the State of Georgia, filed this action under 42 U.S.C. § 1983 claiming that, because of his unique medical issues, the State of Georgia's lethal injection method of execution will cause him excessive pain in violation of his Eighth Amendment rights. As a solution, Plaintiff suggests that the State could avoid the unreasonable risk of pain by executing him by firing squad.

In their Motion, Defendants contend that the complaint should be dismissed because (1) Plaintiff's claims are time-barred under the applicable two-year statute of limitations, (2) Plaintiff's complaint fails to state a plausible claim for relief, and (3) Plaintiff has failed to properly exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.

## II. Discussion

### A. Plaintiff's Claims

In his complaint, Plaintiff claims that he has been taking prescription gabapentin since April 2016.  ECF No. 1 at 14.  Gabapentin is an anti-epileptic drug, which is also prescribed for nerve pain.  Plaintiff takes it for back pain.

According to Plaintiff, prolonged gabapentin use alters a person's brain chemistry and makes the person's brain less responsive, or even unresponsive, to certain other drugs, including pentobarbital.  As a result, Plaintiff contends that there is a risk that the pentobarbital that the State intends to use to execute him will not render him unconscious while at the same time, the pentobarbital's effect on his respiratory system will be undiminished.  If that were to happen, Plaintiff asserts that he would suffer from the painful effects of respiratory and organ failure while fully conscious.

AO 72A
(Rev.8/82)

Plaintiff also claims that his veins are compromised and not suitable for intravenous (IV) insertion of pentobarbital.  He contends that finding a suitable vein "will likely require multiple painful needle insertions and blind attempts by the IV team."  ECF No. 1 at 11.  Plaintiff further contends that his veins are "heavily scarred, tortuous, and have thin walls," *id.*, and if pentobarbital is injected into one of his veins, there is a risk that the vein will "blow," causing pentobarbital to leak into surrounding tissue, which would result in burning pain and "incomplete and inconsistent drug delivery [and] a prolonged and only partially anesthetized execution."  *Id.* at 12.

Plaintiff also contends that the Georgia Department of Corrections' (GDOC) lethal execution protocol provides for the alternative of a central venous cannulation[1] if IV access cannot be established, and he claims that such a procedure would cause him intolerable pain.  According to Plaintiff, if central venous cannulation is not viable, "upon information and belief, the Execution

---

[1] "Central venous cannulation is a technique for gaining access to one of the major veins in an individual's body, such as the jugular or femoral veins." *Gissendaner v. Commr., Georgia Dept. of Corrections*, 779 F.3d 1275, 1278 (11th Cir. 2015) (citation omitted).  The procedure entails inserting a catheter into a central vein located either in the groin or above or below the clavicle.  The National Institutes of Health describes central venous cannulation as "a commonly performed procedure."  *See* information available at www.ncbi.nlm.nih.gov/pmc/articles/PMC3270925/.

Team will attempt to perform a cutdown procedure," whereby an incision is made to find a suitable vein, which would also be intolerably painful as well as bloody. *Id.* at 13.

Plaintiff also raises numerous issues related to the IV delivery of pentobarbital under Georgia's execution protocol. According to Plaintiff, the execution team administering the pentobarbital into his IV tube will not be in the same room as Plaintiff, and they thus will be unaware if complications arise in the application of the lethal injection drug. Because the IV team is in another room, the IV tubing for delivery of the pentobarbital is too long, creating a risk of "incomplete delivery of the drug" and a "prolonged and/or partially anesthetized execution." *Id.* at 17.

Plaintiff further alleges that the pentobarbital that the State receives from a compounding pharmacy is poor in "quality, potency, purity or stability," *id.*, and that the "[m]embers of the execution team lack the professional skills, training, and/or necessary equipment to safely and humanely perform these procedures" of central venous cannulation or a cutdown, *id.* at 17-18. As an alternative, Plaintiff proposes that he be executed by firing squad, "which would significantly reduce the substantial risk of severe pain." *Id.* at 20-21.

4

**B. Statute of Limitaions**

An action brought pursuant to § 1983 is subject to the statute of limitations governing personal injury actions in the state where the challenge is brought. *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 872-76 (11th Cir. 2017); *Gissendaner v. Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015). In Georgia, the statute of limitations for personal injury actions is two years. *Gissendaner*, 779 F.3d at 1280. Because the statute of limitations is an affirmative defense, dismissal under Fed. R. Civ. P. 12(b)(6) on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred. *Id.*

While the limitations period for a § 1983 claim is governed by the applicable state law, federal law determines when a claim accrues. *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987). Under federal law, actions brought pursuant to § 1983 accrue "from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003). The right of action for a method-of-execution challenge "'accrues on the later of the date on which' direct review is completed by denial of certiorari, 'or the date on which the capital litigant becomes subject to a new or substantially

changed execution protocol.'" *Gissendaner*, 779 F.3d at 1280 (quoting *McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008)).

The United States Supreme Court denied Petitioner's petition for certiorari on direct review on October 2, 2006. *Nance v. Georgia*, 549 U.S. 868 (2006).   In 2001, Georgia adopted lethal injection as its method of execution. O.C.G.A. § 17-10-38(a) (stating "[a]ll persons who have been convicted of a capital offense and have had imposed upon them a sentence of death shall suffer such punishment by lethal injection"); *Gissendaner*, 779 F.3d at 1281.  In March 2013, Georgia changed from using a single dose of FDA-approved pentobarbital to using a single dose of compounded pentobarbital. *Gissendaner*, 779 F.3d at 1281.[2]  The Eleventh Circuit has held that the State's change to the use of compounded pentobarbital is not a substantial change to Georgia's execution protocol. *Id.* at 1281-82.  Thus, as a general matter, Petitioner's method-of-execution claim accrued in October 2006 and must have been filed by October 2008 to be timely.  *See Gissendaner*, 779 F.3d at 1280; *Ledford v. Commr., Georgia Dept. of Corrections*, 856 F.3d 1327, 1330

---

[2] This Court notes that the GDOC's current Lethal Injection Procedures, attached as Exhibit A to Plaintiff's complaint, ECF No. 1-1, which was adopted on July 17, 2012, states that condemned prisoners will be executed with a five-gram does of pentobarbital.  Accordingly, it appears that the State adopted the single dose of pentobarbital before 2013.

(11th Cir. 2017).  The absolute latest that his claims would have accrued is 2012 or 2013 when the state switched to pentobarbital and adopted its current protocol.

Plaintiff concedes that any facial challenge that he makes to Georgia's execution protocol is untimely,[3] but he argues that his "as-applied" claims—specifically his claims that his long-term use of gabapentin and his compromised veins render it more likely that he will suffer constitutionally intolerable pain or discomfort during his execution—did not accrue until the time that a reasonable layperson would understand that he faced risks during his execution due to his medical history.  According to Plaintiff, the limitations period did not begin to run with respect to his compromised-vein claim until May 2019, when a medical technician at the prison informed Plaintiff that, because of his veins, the execution team would have to cut his neck to carry out the execution.  Plaintiff further claims that the limitations period did not run on his gabapentin claim until he "became aware, or should have become aware, that his prolonged

_____

[3] Indeed, despite appearances otherwise, Plaintiff states that he raises only as-applied challenges to Georgia's lethal injection protocol based on his compromised veins and his prolonged use of gabapentin.  [Doc. 22 at 2].  His assertions regarding the other aspects of the State's execution protocol are merely offered in support of those as-applied challenges.  As a result, this Court's discussion is limited to his as-applied claims.

7

use and increasing dosages, would affect the efficacy of pentobarbital and impact his execution." ECF No. 22 at 5.  He does not, however, specify when that was.

As Defendants points out, Plaintiff does not cite to any case law in support of his argument that a layperson's lack of technical knowledge or technical expertise might delay the accrual of a cause of action under § 1983.  In *Ledford*, cited above, J.W. Ledford claimed that his prolonged use of the drug gabapentin left him susceptible to a painful execution by pentobarbital.  The Eleventh Circuit determined that Ledford's claim was time-barred after noting that "Ledford also alleges that he has been taking gabapentin for approximately a decade," and his claims "about the interaction of those two drugs—compounded pentobarbital and gabapentin—are filed too late." *Ledford*, 856 F.3d at 1330.  As is noted above, according to the complaint, Plaintiff has been taking prescription gabapentin since April, 2016, over three years before he filed his complaint.  Because Plaintiff knew that he was taking gabapentin and knew that the State planned to execute him using pentobarbital, and because Plaintiff makes no claim about when he learned of the potential adverse interaction between the two drugs, Plaintiff's gabapentin claim is clearly time-barred.  Moreover, in response to Plaintiff's implied claim that he learned of the potential problems resulting from his gabapentin use recently, this Court concludes that his knowledge that he took gabapentin and would be executed

with pentobarbital was sufficient to put him on notice that he should inquire whether there might be some adverse interaction between the two drugs.

As to his claim regarding his compromised veins, in *Gissendaner*, also cited above, Gissendaner raised a method-of-execution challenge, claiming that her obesity and possible sleep apnea left her susceptible to an increased risk of pain during her execution by lethal injection. The Eleventh Circuit concluded that Gissendaner's claims were time-barred after noting that her "complaint contains no factual allegations suggesting that her obesity or her potential sleep apnea (the chance of which is increased by her obesity) are recent developments." *Gissendaner*, 779 F.3d at 1281. Likewise, Plaintiff has made no claim that his veins became compromised within the past two years.

Neither *Ledford* nor *Gissendaner* addressed arguments like Plaintiff's that his claim did not accrue until he learned of the potential for his medical conditions to cause problems if pentobarbital is administered during his execution. But the limited analogous, persuasive case law determining when claims accrue in § 1983 actions indicate that Plaintiff's argument is unavailing. For example, in *Hawkins v. Spitters*, 79 Fed. Appx. 168 (6th Cir. 2003), Stacy Hawkins, a prisoner, raised a deliberate indifference to serious medical needs claims under § 1983 against a physician who had repeatedly refused to refer him for testing to determine whether

AO 72A
(Rev.8/82)

he suffered from sleep apnea.  The Sixth Circuit determined that the claim was time-barred because Hawkins failed to raise the claim within the applicable three-year statute of limitations.  Hawkins argued that his claim did not accrue until he was actually diagnosed with sleep apnea, "otherwise his claim would be mere speculation about his condition," but the court rejected that argument, holding that the claim accrued when the physician rejected his request.  *Id.* at 169.

Some case law, however, indicates that a claim will not accrue until certain knowledge is gained by the plaintiff.  For example, in *Diaz v. United States*, 165 F.3d 1337, 1338 (11th Cir. 1999), Alejandro Diaz committed suicide while in prison.  Prison officials informed  Diaz's wife that they had no indication or warning that he might kill himself.  Only later did the wife learn that Diaz had been treated by psychologists and had reported "a fifty pound weight loss during the preceding weeks, recurring depression, anxiety, headaches, insomnia, racing thoughts and other symptoms" as well as suicidal thoughts.  *Id.*  The Eleventh Circuit concluded that the wife's medical malpractice, wrongful death, and negligence claims under the Federal Tort Claims Act (FTCA) accrued when the wife learned that Diaz had received psychological treatment rather than at the time of Diaz's death.  *Id.* at 1341.  Central to the Eleventh Circuit's holding, however, was that the facts indicating a causal link between Diaz's death and the actions of

prison officials were in the control of those prison officials. *Id.* at 1339. In this case, there is no indication that state officials had superior knowledge of the status of Plaintiff's veins.

This Court also credits Defendants' argument that under Plaintiff's theory, "he could simply sit back and wait, ostensibly for as long as he wanted, to ascertain the alleged impact of a perceived injury under § 1983," ECF No. 25 at 5, which would defeat the purpose of the statute of limitations. In *United States v. Kubrick*, 444 U.S. 111 (1979), the plaintiff sued a Veterans Affairs physician under the FTCA alleging negligence/medical malpractice for causing a hearing loss by improperly prescribing a neomycin treatment. In reversing the court of appeals and holding that the claim accrued when the neomycin treatment occurred rather than when another physician informed him that the neomycin treatment had been improper, the Supreme Court noted,

> it is apparent, particularly in light of the facts in this record, that the Court of Appeals' rule would reach any case where an untutored plaintiff, without benefit of medical or legal advice and because of the "technical complexity" of the case, would not himself suspect that his doctors had negligently treated him. As we understand the Court of Appeals, the plaintiff in such cases need not initiate a prompt inquiry and would be free to sue at any time within two years from the time he receives or perhaps forms for himself a reasonable opinion that he has been wronged. In this case, for example, Kubrick would have been free to sue if Dr. Soma had not told him until 1975, or even 1980, instead of 1971, that the neomycin treatment had been a negligent act.

11

*Id.* at 118 (citation to the record omitted).  This Court similarly rejects Plaintiff's argument for an open ended date for the accrual of his claim that is based on when he happens to discover information purportedly sufficient to inform him that he has a viable claim.

This Court also points out that central venous cannulation and the cut-down procedure[4] have been a part of Georgia's execution protocol at least since 2012, and, to the degree that he now claims that those procedures would cause intolerable pain, Plaintiff has been on notice that he might be subject to them for several years.

Having reviewed the record, this Court concludes that Plaintiff's as-applied claims are barred by the statute of limitations.

### C. Failure to State a Claim

Even if Plaintiff is correct that his compromised-vein claims did not accrue until the prison medical technician put him on notice of the potential problem, this Court agrees with Defendants that the claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiff has failed to state a viable claim for relief.

Pursuant to Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

---

[4] As discussed below, it is not clear that a cut-down procedure is a part of the GDOC's lethal injection protocol.

Although detailed factual allegations are not necessarily required, the pleading must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In order to state a claim of an Eighth Amendment risk of future harm, the alleged "conditions presenting the risk must be sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers." *Gissendaner*, 779 F.3d at 1283.

Defendants first argue that Plaintiff's claim regarding his compromised veins fails because "Georgia's lethal injection protocol accounts for the possibility of an inmate's veins being compromised." ECF No. 19 at 17. As noted above, *see supra* n.2, Plaintiff has attached the Georgia lethal injection protocol to his complaint. In that protocol, it states:

> The IV Team will provide two (2) intravenous accesses into the condemned. If the veins are such that intravenous access cannot be provided, a Physician will provide access by central venous cannulation or other medically approved alternative.

13

ECF No. 1-1 at 7; *see Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls."). Accordingly, this Court agrees with Defendants that, to the degree that Plaintiff contends that his veins might "blow" when injected with pentobarbital, Plaintiff fails to state a viable claim because Georgia's protocol mandates that a physician perform a medically-approved alternative method if the condemned prisoner has veins that are not amenable to establishing an intravenous line.

While it is possible that Plaintiff may experience pain if the IV Team unsuccessfully attempts to establish intravenous access, such pain would be *de minimis* as it would be no worse than that encountered when visiting a physician or donating blood. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) ("[T]he Eighth Amendment does not guarantee a prisoner a painless death.").

Further, this Court must presume that "state officials carr[y] out their duties under the death warrant in a careful and humane manner." *State of La. ex rel. Francis v. Resweber*, 329 U.S. 459, 462 (1947).[5] Plaintiff has made no allegation

---

[5] In addition to *Resweber*, the Supreme Court has more recently held that state government officials are presumed to carry out their duties in a good-faith manner and in compliance with the federal laws. *Alaska Dep't of Envtl.*

14

that would serve to overcome the presumption.[6]  In contrast, GDOC officials

certainly have a strong interest in executing its condemned prisoners in a manner

that does not violate their rights.  Botched executions lead to embarrassment,

investigations, bad press and, for those involved, the knowledge that they caused

an individual needless pain and suffering.

As Plaintiff has failed to rebut the presumption, this Court must apply it.

Given that presumption, Plaintiff has no basis to allege that state officials will,

effectively, torture him by repeatedly sticking him with a needle in a fruitless effort

to locate a suitable vein.

In response to Plaintiff's claim that, because the IV Team is not in the

execution chamber it is "very unlikely that they could recognize [an] extravasation

---

*Conservation v. E.P.A.*, 540 U.S. 461, 507, (2004); *National Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (discussing the presumption of regularity under which courts can presume that government officials have faithfully carried out their duties); *Alden v. Maine*, 527 U.S. 706, 755 (1999) ("We are unwilling to assume the States will refuse to honor . . . or obey the binding laws of the United States.").

[6]  In his complaint, Plaintiff does claim that "[m]embers of the execution team lack the professional skills, training, and/or necessary equipment to safely and humanely perform" a central venous cannulation or a cutdown procedure.  ECF No. 1 at 17.  However, this claim is clearly refuted by the GDOC lethal injection protocol, attached to the complaint, which states that a physician will perform those procedures.  ECF No. 1-1 at 4; *see Hoefling*, *supra*.

and take timely, appropriate action," this Court finds that the claim is false.  As the

state's protocol makes clear:

> Throughout the lethal injection process, an IV Nurse will monitor the
> progress of the injection *in the Execution Chamber* to ensure proper
> delivery of chemicals and to monitor for any signs of consciousness.
> If the IV Nurse in the execution chamber observes a problem with
> intravenous flow, the Nurse will inform the attending Physician, who
> will inform the Warden as to whether or not using an alternative
> intravenous access is appropriate.  The Warden will give the
> appropriate instructions to the Injection Team.

ECF No. 1-1 at 5 (emphasis supplied).  As this passage from the State's protocol

clearly refutes Plaintiff's claim, *see Hoefling*, *supra*, this Court concludes that the

claim is unavailing.

As to Plaintiff's claim that officials may have to resort to central venous

cannulation, which would cause him pain, this Court again refers to the

presumption that state officials will carry out their duties humanely and carefully,

*Resweber*, 329 U.S. at 462, and repeats that central venous cannulation is a routine

procedure, *see supra* n.1.  As such, this Court must presume that, to the degree that

cannulation would cause constitutionally intolerable pain, the physician performing

the procedure would provide the appropriate anesthetic.

Finally, regarding Plaintiff's claim that, if cannulation is not successful the

physician will resort to a cut-down procedure—where a physician would cut an

16

incision into Plaintiff's arm or leg in order to locate a suitable vein—this Court first notes that Plaintiff's claim is entirely speculative because it is based on Plaintiff's "information and belief."  ECF No. 1 at 13.  In fact, it is not at all clear that Georgia would use a cut-down procedure.  The GDOC's protocol states that "[i]f the veins are such that intravenous access cannot be provided, a Physician will provide access by central venous cannulation or *other medically approved alternative*."  ECF No. 1-1 at 4 (emphasis supplied).  Plaintiff contends that the other alternative would be a cut-down procedure, but has not expanded on the basis of that belief.  According to the Supreme Court, this Court "can and should . . . invok[e its] equitable powers to dismiss or curtail [method of execution challenges] that are . . . based on speculative theories." *Bucklew*, 139 S. Ct. at 1134 (quotations and citations omitted).

As far as this Court can determine, utilization of a cut-down procedure in an execution is quite rare.  This Court is aware of only one, or possibly two,[7] cut-down procedures during an execution in the United States.  The one well-known instance was the 1992 execution of Rickey Ray Rector by Arkansas. *See Nooner v. Norris*, 594 F.3d 592, 604 (8th Cir. 2010).  In *Nooner*, the Eighth Circuit discussed the

---

[7] In *Bucklew*, 139 S. Ct. at 1131, the Supreme Court noted that the warden of a Missouri prison testified that he "once saw medical staff perform a cut-down as part of an execution."

Rector execution and concluded that the plaintiffs raising a claim that Arkansas'

protocol permitted the use of a cut-down procedure had failed to establish an

Eighth Amendment violation because (1) the procedure would be performed by "a

licensed physician who is properly qualified to carry out the procedure," and (2)

the physician would use local anesthetic as necessary to avoid pain.  *Id.*  In other

cases where a cut-down procedure has been challenged by condemned prisoners,

the claims were generally denied as moot when state officials stated that they

would not use a cut-down procedure.  *E.g.*, *Cooey v. Strickland*, 589 F.3d 210, 228

(6th Cir. 2009); *Boyd v. Beck*, 404 F. Supp. 2d 879, 885 (E.D.N.C. 2005).

Again this Court must apply the unrebutted presumption that state officials

will act carefully and humanely in carrying out a death warrant.  *Resweber*, 329

U.S. at 462.  As such, this Court must further presume that, to the degree that a

physician must resort to a cutdown procedure, he will do so in a humane manner as

accepted by the Eighth Circuit in *Nooner*.  Because Plaintiff's allegation that his

veins are compromised fails to allege a condition that will very likely cause

"serious illness and needless suffering and give rise to sufficiently imminent

danger," *Gissendaner*, 779 F.3d at 1283, this Court concludes that Plaintiff has

failed to state a viable Eighth Amendment claim, and his compromised-vein claim

is thus dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### D. Exhaustion of Remedies

Defendants also contend that Plaintiff has failed to properly exhaust his administrative remedies.  Plaintiff did file a prison grievance, but it is undisputed that Plaintiff did not complete the administrative remedy process available to him.

Under the Prison Litigation Reform Act, a prisoner may not file a § 1983 action "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The Eleventh Circuit has interpreted this requirement to mean that prisoners "'must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit.'"  *Bryant v. Rich*, 530 F.3d 1368, 1372–73 (11th Cir. 2008) (quoting *Johnson v. Meadows*, 418 F.3d 1152, 1156 (11th Cir. 2005)).  However, "[a] remedy has to be available before it must be exhausted, and to be 'available' a remedy must be 'capable of use for the accomplishment of [its] purpose.'"  *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting *Goebert v. Lee County*, 510 F.3d 1312, 1322–23 (11th Cir. 2007)).  "Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available."  *Id.*

In a recent order entered in *Martin v. Ward*, No. 1:18-cv-4617 (N.D. Ga. Nov. 21, 2019) (hereinafter Martin Order) (ECF No. 21), a § 1983 method-of-execution action, Judge Brown noted that in *Ross v. Blake*, 136 S. Ct. 1850, 1859

19

(2016), the Supreme Court expanded the concept of what it means when a remedy

is not available under § 1997e(a).

> [A]s *Booth*[8] made clear, an administrative procedure is unavailable
> when (despite what regulations or guidance materials may promise) it
> operates as a simple dead end—with officers unable or consistently
> unwilling to provide any relief to aggrieved inmates.  *See* 532 U.S. at
> 736, 738.  Suppose, for example, that a prison handbook directs
> inmates to submit their grievances to a particular administrative
> office—but in practice that office disclaims the capacity to consider
> those petitions.  The procedure is not then "capable of use" for the
> pertinent purpose.  In *Booth's* words: "[S]ome redress for a wrong is
> presupposed by the statute's requirement" of an "available" remedy;
> "where the relevant administrative procedure lacks authority to
> provide any relief," the inmate has "nothing to exhaust."  *Id.* at 736
> and n.4.  So too if administrative officials have apparent authority, but
> decline ever to exercise it.  Once again: "[T]he modifier 'available'
> requires the possibility of some relief."  *Id.* at 738.  When the facts on
> the ground demonstrate that no such potential exists, the inmate has no
> obligation to exhaust the remedy.

*Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016).

Judge Brown further noted that under the GDOC's "published grievance

policy, '[m]atters over which the Department has no control, including parole

decisions, sentences, probation revocations, court decisions, and any matters

established by the laws of the state' are 'non-grievable issues.'"   Martin Order at 8

(citing the state grievance policy).  Judge Brown also noted that GDOC officials

---

[8] *Booth v. Churner*, 532 U.S. 731 (2001).

routinely disclaim the authority to consider grievances that raise method-of-
execution claims.  *Id.*  Accordingly, Judge Brown concluded that

> [i]f, in response to every single grievance raising a method-of-
> execution challenge, [GDOC] officials have always responded that
> they lack authority to grant relief, the Court finds that this grievance
> procedure is the "simple dead end" discussed in *Ross* where officials
> "disclaim[] the capacity to consider those petitions."  136 S. Ct. at
> 1859.  The Court thus agrees with Plaintiff that relief is unavailable
> under [GDOC]'s grievance procedure and that lack of exhaustion must
> be excused.

*Id.* at 9.

Relying on Judge Brown's analysis, this Court concludes that exhaustion
must likewise be excused in this case.

### III. Defendant's Motion to Exceed Page Limits

Pursuant to Local Rule 7.1(D) (N.D. Ga.), motions filed in this Court are
limited to twenty-five pages.  Along with their motion to dismiss, Defendants filed
a motion to exceed that limit by seven pages.  ECF No. 17.  In opposing the
motion, ECF No. 21, Plaintiff points out that under the undersigned's Standing
Order Regarding Civil Litigaion, ECF No. 4,

> Parties seeking an extension of the page limit must do so at least five
> days in advance of their filing deadline and should explain with
> specificity the reasons necessitating the extension.  If a party files a
> motion to extend the page limit at the same time his or her brief is due,
> the extension request will be denied absent a compelling and
> unanticipated reason for violating the rule.  The Court will also not

consider any arguments made in pages which exceed the Local Rules'
requirements.

*Id.* at 12.

Under Local Rule 7.1(F), this Court has the discretion to waive application
of the page limit, and the undersigned has the authority to waive the requirements
of the standing order.  While Plaintiff's arguments are well-taken, and counsel for
Defendants should not have ignored the standing order, in the interests of justice
and efficiency, this Court will exercise its discretion and waive the page limits in
the Local Rules and the requirements of the standing order.

**IV. Conclusion**

For the foregoing reasons, **IT IS ORDERED** that Defendants' motion to
dismiss, ECF No. 19, is **GRANTED** and the instant action is hereby **DISMISSED**
as untimely under the applicable statute of limitations and for failure to state a
claim under Fed. R. Civ. P. 12(b)(6) as discussed above.  Defendants' motion to
exceed the page limit, ECF No. 17, is, for good cause shown, **GRANTED** nunc pro
tunc.  Defendants' motion to stay discovery, ECF No. 20, is **DENIED** as moot.

The Clerk is **DIRECTED** to **CLOSE** this action.

22

AO 72A
(Rev.8/82)

**SO ORDERED**, this ___13th___ day of March, 2020.

**J. P. BOULEE**
United States District Judge