## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MICHAEL WADE NANCE,      )
                            )
      Plaintiff,           )
                            )
v.                         )
                            )      CIVIL ACTION NO.:
TYRONE OLIVER, Commissioner,  )      1:20-cv-00107-JPB
Georgia Department of Corrections,  )
                            )
ANTOINE CALDWELL, Warden,    )
Georgia Diagnostic and Classification )
Prison,                     )
      Defendants.       )
_____)

## AMENDED COMPLAINT OF MICHAEL WADE NANCE

1.    This is an action by Michael Wade Nance seeking to have the court order Defendants not to execute Mr. Nance under their current execution policies and procedures and to enforce Mr. Nance's rights under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution.

2.    Mr. Nance is a death-sentenced prisoner whom Defendants intend to execute by lethal injection. Mr. Nance's veins are extremely difficult to locate through visual examination, and those veins that are visible are severely compromised and unsuitable for sustained intravenous access. If Defendants attempt to execute Mr. Nance by lethal injection, there is a substantial risk that Mr.

Nance's veins will lose their structural integrity and "blow," leading to the leakage of the lethal injection drug into the surrounding tissue. The leakage of the lethal injection drug causes intense pain and burning in the surrounding tissue, and also results in inadequate or inconsistent drug delivery, leading to a prolonged execution that will produce excruciating pain.

3.     In addition, Mr. Nance has been taking increasing dosages of prescription gabapentin for several years to treat chronic back pain. Mr. Nance's continuous exposure to gabapentin has altered his brain chemistry in such a way that pentobarbital will no longer reliably render him unconscious and insensate, further creating and exacerbating the substantial risk that Mr. Nance will consciously suffer a prolonged and painful execution.

4.     Accordingly, Defendants' current execution protocol presents a substantial risk of serious harm to Mr. Nance that is objectively intolerable, in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Defendants could avoid subjecting Mr. Nance to a gratuitously painful execution by implementing a readily available alternative, namely death by firing squad, which would significantly reduce the substantial risk of severe pain.

## THE PARTIES

5.     Plaintiff Michael Nance is a United States citizen and resident of the State of Georgia. He is a death-sentenced prisoner currently being held in the custody of Defendants at the Georgia Diagnostic and Classification Prison (the "Prison") in Jackson, Georgia.

6.     Defendant Tyrone Oliver is the commissioner of the Georgia Department of Corrections ("DOC"), which is headquartered in Atlanta, Georgia. He is being sued here in his official capacity.

7.     As commissioner, Defendant Oliver is responsible for the supervision, direction, and execution of operations at the DOC.

8.     Oliver has a duty to ensure that executions are carried out in compliance with DOC procedure.

9.     Oliver also has a duty to ensure that executions are carried out in a manner consistent with and not in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

10.     Defendant Antoine Caldwell is the warden of the Prison. He is being sued here in his official capacity.

11.     As warden, Defendant Caldwell is responsible for the day-to-day operations of the prison.

12.     Caldwell has a duty to ensure that executions are carried out in compliance with DOC procedure.

13.     Caldwell also has a duty to ensure that executions are carried out in a manner consistent with and not in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION

14.     Jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 23 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

15.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b).

## PROCEDURAL HISTORY

16.     In the Superior Court of Gwinnett County in 1997, a jury convicted Mr. Nance for malice murder and five other crimes and sentenced him to death.

17.     On direct appeal, the Georgia Supreme Court affirmed Mr. Nance's convictions but reversed his death sentence.

18.     A new sentencing trial in 2002 resulted in a new death sentence, which the Georgia Supreme Court affirmed on direct appeal.

19.     Mr. Nance then filed a petition for collateral relief in the Superior Court of Butts County. That court granted him relief from the death sentence after concluding that Mr. Nance had received ineffective assistance of counsel at the resentencing trial. The State appealed.

20.     In 2013, the Georgia Supreme Court reversed.

21.     At the end of 2013, Mr. Nance filed a 28 U.S.C. § 2254 petition in this Court. In 2017, this Court denied relief but granted a certificate of appealability on two of Mr. Nance's claims: (1) his trial counsel were ineffective in presenting his case in mitigation, and (2) the trial court erred in requiring him to wear a stun belt during the resentencing trial.

22.     On April 30, 2019, the United States Court of Appeals for the Eleventh Circuit rejected Mr. Nance's claims and affirmed the decision by the Georgia Supreme Court.

23.     The United States Supreme Court denied certiorari on March 23, 2020.

## FACTUAL BACKGROUND

### A. Georgia's Lethal Injection Procedure.

24.     The Georgia Code states that "[a]ll persons who have been convicted of a capital offense and have had imposed upon them a sentence of death shall suffer such punishment by lethal injection." O.C.G.A. § 17-10-38(a).

25.     The Georgia Code defines "[l]ethal injection" as "the continuous intravenous injection of a substance or substances sufficient to cause death into the body of the person sentenced to death until such person is dead." *Id*.

26.     In conducting an execution, the DOC and the Prison maintain and follow the Lethal Injection Procedures (attached as **Exhibit 1**, hereinafter "Protocol" or "Protocols").

27.     The Protocol specifies that a single drug—compounded pentobarbital—is to be used for all lethal injections.

28.     Defendants obtain the compounded pentobarbital used in lethal injections from a compounding pharmacy.

29.     The identity of the compounding pharmacy that manufactures the pentobarbital for executions is a confidential state secret. O.C.G.A. § 42-5-36(d).

30.     The origin and identity of the ingredients used by the compounding pharmacy to manufacture the pentobarbital is also a confidential state secret. *Id.*

31.     The compounded pentobarbital used by Defendants to carry out executions is not subject to the Food and Drug Administration's (FDA) drug-approval process or manufacturing standards. Consequently, Defendants' compounded pentobarbital has not met the FDA's standards for quality, potency, purity, and stability.

32.     Upon information and belief, the compounding pharmacy that manufactures Defendants' compounded pentobarbital does not test the compounded pentobarbital for quality, potency, purity, or stability prior to delivering it to Defendants.

33.     Since 2015, there have been problems with the quality of the pentobarbital possessed by the State of Georgia for use in executions, including pentobarbital that has appeared cloudy. Because of the secrecy surrounding Georgia's sourcing of the drug, there is no assurance that the quality, potency, purity, or stability of the drug is consistent with accepted medical practice or industry standards.

34.     The Protocol states that two physicians must be present at the execution to "determine when death supervenes" and "provide medical assistance during the execution." *Id.*

35.     The Protocol also requires an "IV Team" to be present for executions. The IV Team must "consist of two (2) or more trained personnel, including at least one (1) Nurse, to provide intravenous access." *Id.*

36.     The Protocol also requires an "Injection Team" to be present for executions. The Injection Team consists of "three (3) trained staff members to inject solutions into the intravenous port(s) during the execution process." *Id.*

37.     The IV Team is responsible for providing "two (2) intravenous accesses into the condemned. If the veins are such that intravenous access cannot be provided, a Physician will provide access by central venous cannulation or other medically approved alternative." *Id*. at 4.

38.     Under the Protocol, members of the Injection Team inject five grams of compounded pentobarbital into the IV from which the drug is delivered to the prisoner. *Id.* at 5. The Injection Team must inject three different syringes—the first two syringes each containing 2.5 mg of pentobarbital, the third syringe containing 60 cubic centimeters of saline. *Id.*

39.     The Injection Team is not in the same room as the condemned and administers the pentobarbital remotely through many feet of IV tubing. Upon information and belief, this necessitates the use of several 72-inch extension sets of tubing.

40.     This unnecessarily increases the risk of leakage and/or pinching of the tubing, thereby creating a greater risk that the prisoner will not receive the full dose of pentobarbital.

41.     Further, the longer the IV tubing, the longer the injected drugs will be in contact with the walls of the tubing. This allows resistance to play a larger role in the overall flow of the drugs and introduces significantly more variation and risk into the process.

42.     Also, the only effective means of detecting problems with the IV is to gauge the amount of resistance in the tubing, an assessment that is made more difficult with longer IV tubing. Additionally, the execution team, on information and belief, does not possess the training necessary to gauge this resistance.

43.     Thus, the fact that the drug is injected into the IV in another room and must travel through many feet of IV tubing with 60 cubic centimeters of saline before reaching the prisoner's vein creates a substantial risk that the intended fatal dose of pentobarbital is not delivered consistently or completely to the prisoner.

44.     Under the Protocol, the Warden is authorized to instruct the Injection Team to administer an additional dose of 5 mg of pentobarbital, and an additional 60 cubic centimeters of saline, if the prisoner still exhibits visible signs of life. *Id.*

45.     The Warden is also authorized to repeat the entire process over again, should the prisoner continue to exhibit signs of life after the completion of the injections. *Id.*

46.     Georgia has executed twenty-two (22) persons with compounded pentobarbital under the Protocol. The range in duration of the executions spans from at least eight (8) to twenty-seven (27) minutes.

47.     The autopsies of at least fifteen (15) of those individuals reveal that each suffered a significant degree of fluid congestion in their lungs, while at least seven (7) experienced fulminant pulmonary edema.

**B. Mr. Nance's Severely Compromised Veins.**

48.     Mr. Nance's veins are severely compromised.

49.     When receiving medical attention that requires blood to be drawn, medical technicians have difficulty locating a suitable vein in Mr. Nance.

50.     Obtaining and maintaining intravenous access as required in a lethal injection is more invasive and requires far more venous structural integrity than drawing blood.

51.     On or around May 2019, a medical technician at the Prison told Mr. Nance that if he were to be executed by lethal injection, the execution team would

have to cut his neck to carry out the execution because they would not otherwise be able to obtain sustained intravenous access.

52.     Upon information and belief, the medical technician was referring either to a procedure whereby the execution team would obtain sustained venous access through central venous cannulation or a surgical procedure known as a cutdown.

53.     Mr. Nance had a physical examination by an anesthesiologist on October 28, 2019.

54.     The examination revealed that there are no discernible veins on visual examination in Mr. Nance's forearms or left or right antecubital fossa and that Mr. Nance's lower extremities also lack visible and palpable veins.

55.     The insertion of an intravenous catheter into Mr. Nance for a lethal injection will likely require multiple painful needle insertions and blind attempts by the IV team to locate a suitable vein.

56.     The veins that are discernible in Mr. Nance, either through sight or touch, are heavily scarred, tortuous, and have thin walls.

57.     Insertion of an intravenous catheter into a scarred and tortuous vein is extremely difficult and presents a substantial risk that the vein will "blow" and lose

its structural integrity, causing the injected pentobarbital to leak into the surrounding tissue.

58.     The medical term for this leakage is extravasation.

59.     The extravasation of pentobarbital due to a blown vein would cause Mr. Nance to experience intense and painful burning in the surrounding tissue.

60.     The extravasation of pentobarbital due to a blown vein would also lead to incomplete and inconsistent drug delivery to Mr. Nance, which would result in a prolonged and only partially anesthetized execution wherein Mr. Nance would experience the excruciating feeling of suffocating to death.

61.     In addition, the fact that, under the Protocol, the Injection Team is not in the same room as the condemned and administers the pentobarbital remotely through many feet of IV tubing significantly lessens the probability that the Injection Team would even be aware of a blown vein when it occurs, making it very unlikely that the Injection Team could recognize the extravasation and take appropriate action in a timely manner.

**C.   Alternatives to Intravenous Access.**

62.     The Protocol specifies central venous cannulation as an alternative method of injection if intravenous access cannot otherwise be established. Exhibit 1, at 4.

63.     Central venous cannulation entails inserting a catheter into a central vein located either in the groin, or above or below the clavicle.

64.     Central venous cannulation requires adequately trained and experienced medical personnel and specific tools and equipment to locate and catheterize a central vein.

65.     Central venous cannulation is a complicated medical procedure which should only be performed by properly trained and experienced medical personnel with access to the necessary tools and equipment and sufficient proficiency in using those tools and equipment.

66.     Central venous cannulation is almost always performed on a subject who is sedated.

67.     The Execution Team does not have the training, experience, or expertise needed to perform a central venous cannulation correctly, precisely, and competently.

68.     The Execution Team does not have access to the medical tools and equipment needed to perform a central venous cannulation correctly, precisely, and competently.

69.     The Execution Team does not have sufficient proficiency in using the medical tools and equipment needed to perform a central venous cannulation correctly, precisely, and competently.

70.     The Execution Team will not sufficiently sedate Nance before attempting to perform a central venous cannulation.

71.     If done incorrectly, imprecisely, and/or incompetently due to improper tools and equipment, improper training, insufficient sedation, and/or any other issue, attempts at central venous cannulation and/or improper central venous cannulation risk a failure to obtain intravascular access by, for example, extravascular cannulation; extravasation; hitting a lung leading to a pneumothorax; or puncturing an artery, leading to excessive and uncontrolled bleeding; individually or collectively creating a substantial risk of an extremely painful procedure, and a torturous and botched execution.

72.     The Execution Team is not prepared to handle the consequences and/or complications of any of the risks resulting from an incorrect, imprecise, or incompetent central venous cannulation, thereby increasing the substantial risk that the execution will be extremely painful, torturous, and botched.

73.     Execution teams have had difficulties successfully performing central venous cannulation under similar circumstances.

74.     For example, during the execution of Clayton Lockett in Oklahoma on April 29, 2014, the execution team could not successfully obtain intravenous access due to improper equipment and training of the professionals involved. The team's unsuccessful attempts at cannulation led to the puncture of an artery, the dislodging of the catheter, and extravasation. Mr. Lockett had a swelling at the IV site underneath the skin larger than a golf ball that was not detected until it was clear something was wrong because the site was covered by a sheet.

75.     Due to these serious problems, and the obvious suffering of Mr. Lockett during the failed attempts at lethal injection, the Governor of Oklahoma called off his execution. As a result of the extravasation, Mr. Lockett died of a heart attack minutes later. Following an investigation, the Oklahoma Department of Public Safety found elevated concentrations of the execution drug "in the tissue near the insertion site in the right groin area, which is indicative of it not being administered into the vein as prescribed in execution protocols." Both the physician and paramedic involved in the execution of Clayton Lockett believed that the "viability of the IV access point was the single greatest factor that contributed to the difficulty in administering the execution drugs."[1]

---

[1] *See The Execution of Clayton D. Lockett (Case # 14-0189SI)*, Okla. Dep't of Public Safety, available at

76.     Under the Georgia Protocol, if central venous cannulation is not a viable alternative in a particular execution, upon information and belief, the Execution Team will attempt to perform a cutdown procedure.

77.     A cutdown procedure entails making a deep incision into the subject's skin to find a blood vessel, which is then cut open to allow for the insertion of a catheter.

78.     A cutdown procedure is an extremely painful, bloody, and complicated medical procedure that is rarely used by modern medical professionals.

79.     Because cutdowns are so painful and invasive, they are typically performed on a subject who is under deep sedation, not local anesthetic.

80.     Even on a sedated subject, a cutdown procedure requires greater skill than either intravenous access or central venous cannulation. Because it is so rarely used by modern medical professionals, most medical professionals have never been trained and do not possess the requisite skill to adequately perform a cutdown.

---

https://files.deathpenaltyinfo.org/legacy/documents/LockettInvestigationReport.pdf.

**D.    Mr. Nance's Prescription Usage of Gabapentin.**

81.    Mr. Nance also suffers from chronic back pain.

82.    Since April 2016, Mr. Nance has been administered the drug gabapentin to treat his back pain.

83.    In April 2019, his dosage increased from 800 mg, three times per day, to 900 mg, three times per day. In June 2019, the dosage increased to 1100 mg, three times per day.

84.    Prolonged gabapentin use alters a person's brain chemistry and makes the person's brain less responsive, or even unresponsive, to other drugs, including pentobarbital.

85.    As a result of his prolonged gabapentin use, pentobarbital's capacity to render Mr. Nance unconscious and insensate during his execution will be diminished.

86.    At the same time, pentobarbital's effects on Mr. Nance's respiratory system will remain undiminished, meaning that Mr. Nance will feel the painful effects of the severe respiratory distress and organ failure that occur when pentobarbital is administered for a lethal injection.

87.    In addition, if the lethal injection induces pulmonary edema in Mr. Nance, as it has in at least seven (7) recent executions, Mr. Nance will feel his

lungs filling with fluid, also resulting in the excruciating sensation of suffocating to death.

## CLAIM FOR RELIEF

### Defendants' Lethal Injection Protocol as Applied to Mr. Nance Violates His Eighth and Fourteenth Amendment Rights Under the United States Constitution.

88.     The Eighth Amendment's prohibition against cruel and unusual punishment forbids methods of execution that involve unnecessary or wanton infliction of pain and present a substantial risk of significant harm.

89.     Defendants' current Protocol calls for lethal injection, which requires the insertion of intravenous catheters to administer the lethal drug.

90.     Mr. Nance's difficult-to-locate and heavily scarred, tortuous, irregular, and thin veins create a substantial risk of unnecessary and excruciating pain during efforts to obtain IV access and the administration of the lethal drug.

91.     Because Mr. Nance has severely compromised veins, it will be exceedingly difficult, if not impossible, for the IV Team to establish reliable, sustained intravenous access during the lethal injection procedure.

92.     If the IV Team attempts to insert an intravenous catheter into Mr. Nance's veins, they will very likely be unsuccessful and will, in the process, cause

excruciating pain to Mr. Nance by repeatedly attempting to insert needles into unidentifiable and/or inaccessible veins.

93.     Even if the IV Team eventually does obtain intravenous access on Mr. Nance to administer the lethal drug, Mr. Nance's vein will likely lose structural integrity during the execution, leading to extravasation—the leakage of pentobarbital into the soft tissue surrounding the vein.

94.     Extravasation can have two severely painful results: (1) an inadequate and/or inconsistent drug delivery, which can cause a prolonged and only partially anesthetized execution; and (2) an intense burning of the tissues surrounding the vein.

95.     Assuming the IV Team is even able to find and enter a vein, the risk of extravasation means that Mr. Nance will then be at substantial risk to experience even more intense pain as a result of a prolonged and only partially anesthetized execution as his soft tissue burns within his body.

96.     Given the fact that the Injection Team will not be in the same room as Mr. Nance, it is unlikely to even be aware of the fact that extravasation has occurred.

97.    In addition, the risk of inconsistent and incomplete delivery of the drug to Mr. Nance because it is being administered through many feet of IV tubing increases the risk of a prolonged and/or only partially anesthetized execution.

98.    Poor or reduced quality, potency, purity, or stability of the compounded pentobarbital also increases the risk that Mr. Nance will suffer a prolonged and/or only partially anesthetized execution.

99.    Any factor that results in a prolonged and/or only partially anesthetized execution will cause Mr. Nance to experience excruciating pain as the pentobarbital suppresses his respiratory functioning and causes his organs to fail.

100.    Furthermore, should the attempts to provide intravenous access fail, the alternatives are central venous cannulation or a cutdown. Members of the Execution Team lack the professional skills, training, expertise, and/or necessary tools or equipment, and/or sufficient proficiency in using those tools and equipment, to safely and humanely perform these procedures.

101.    Regardless of the cause, if the drug is inconsistently or inadequately delivered, or if there is a problem with its quality, potency, purity, or stability, Mr. Nance may survive the admissions of the intended lethal dose. If Mr. Nance shows visible signs of life, according to the Protocol, the whole excruciating process will be repeated.

102.   Alternatively, a problem with the quality, potency, purity, or stability of the drug, or failed or inadequate drug delivery could result in brain damage to Mr. Nance, rather than death.

103.   Even if the Defendants' lethal injection drug, pentobarbital, could be humanely and effectively administered to Mr. Nance, his altered brain chemistry resulting from his prescribed use of gabapentin will diminish the efficacy of the drug, which will result in it taking a longer period of time to take effect.  The risk of inadequate or inconsistent drug delivery resulting from the many feet of IV tubing and problems with the quality, potency, purity, or stability of the drug significantly exacerbate this problem.

104.   As a result, Mr. Nance is at a substantial risk of remaining conscious while the pentobarbital suppresses his respiratory system and causes his organs to fail.

105.   Central venous cannulation without sufficient sedation or a cutdown procedure while Mr. Nance is conscious—performed by the Execution Team, which lacks the professional skills, training, expertise, and/or necessary tools or equipment, and/or sufficient proficiency in using those tools and equipment to safely and humanely perform these procedures—would further subject Mr. Nance to excruciating pain.

106.   The pentobarbital injection may also induce pulmonary edema, as is common in Georgia executions. If this occurs, and Mr. Nance is not fully insensate, he will feel his lungs filling with fluid, also resulting in the excruciating sensation of suffocating to death.

107.   Individually or in combination, Mr. Nance's medical conditions (including his gabapentin treatment for chronic back pain); the unknown and untested quality, potency, purity, and stability of the compounded pentobarbital; the execution team's inadequate skill, experience, and training; and other problematic elements of the Protocol as applied to Mr. Nance (i.e., long tubing, remote injection, alternatives to intravenous access) are sure or very likely to cause Mr. Nance needless pain and suffering, and put him in imminent danger.

108.   There is a substantial and objectively intolerable risk that Mr. Nance will experience severe pain and suffering if DOC and the Prison proceed to execute him by lethal injection under the Protocol, in violation of his Eighth Amendment rights.

109.   These risks to Mr. Nance are so substantial and imminent that, if he is executed by lethal injection under the Protocol, the Defendants cannot claim they are subjectively blameless for the purposes of the Eighth Amendment.

110.   There is an alternative method of execution that is feasible and readily implemented which will significantly reduce or eliminate the substantial risk of severe pain to Mr. Nance. That alternative method is execution by a firing squad.

111.   Execution by use of a firing squad is a known and available alternative method. The Supreme Court has held that the firing squad is a constitutionally permissible form of execution.

112.   Since 1976, Utah has carried out three executions by firing squad—most recently on July 18, 2010.[2]

113.   Protocols for execution by firing squad are known and available. Utah's technical manual, specifying the state's execution protocol in great detail, is publicly accessible. *See* Technical Manual of Utah Department of Corrections; *see also Utah Brings Back the Firing Squad, So How Does It Work?*, ASSOCIATED PRESS, Mar. 24, 2015.

114.   Georgia could easily identify qualified personnel to carry out an execution by firing squad. Furthermore, Georgia already has a sufficient stockpile or can readily obtain both the weapons and ammunition necessary to carry out an execution.

---

[2] Kirk Johnson, *Double Murderer Executed by Firing Squad in Utah*, N.Y. TIMES, June 19, 2010, at A12.

115.    Moreover, execution by firing squad is both swift and virtually painless. If performed properly, the use of a firing squad will eliminate the substantial risk of severe pain that Defendants' current execution Protocol presents to Mr. Nance. Evidence and recent experience strongly suggest that the firing squad is significantly more reliable than lethal injection.

116.    Accordingly, an execution by firing squad is a known and available alternative method of execution that presents a substantially lower risk of pain and suffering to Mr. Nance than Defendants' Protocols for lethal injection.

117.    Faced with this viable alternative, if the Defendants refuse to adopt Mr. Nance's proposed alternative, without a legitimate penological justification for adhering to its current method of execution, then it should be viewed as a choice by the Defendants to intensify the sentence of death with a cruel "superaddition" of terror and pain, in violation of the Eighth Amendment of the United States Constitution.

## EXHAUSTION OF ADMINISTRATION REMEDIES

118.    On November 26, 2019, Mr. Nance filed a grievance with DOC concerning his planned execution by lethal injection under DOC's Statewide Grievance Procedure, Policy No. 227.02. Doc. 19-2 at 2.

119.     Mr. Nance's complaints are considered "non-grievable" under DOC's published grievance policy.

120.     Accordingly, this Court has concluded that exhaustion must be excused in this case. Doc. 26 at 21.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Michael Nance respectfully requests that this Court:

1. Enter a declaratory judgment under 42 U.S.C. § 1983 that Defendants' plans to execute Mr. Nance by lethal injection violate Mr. Nance's rights under the Eighth and Fourteenth Amendments of the United States Constitution;

2. Grant injunctive relief to enjoin the Defendants from proceeding with the execution of Mr. Nance by a lethal injection under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution; and,

3.  Issue any further relief as it seems just and proper.

Dated:  April 7, 2023                           Respectfully submitted,

                                                **BAKER & HOSTETLER LLP**


                                                */s/ Ryan E. Harbin*
                                                **John P. Hutchins**
                                                Georgia Bar No. 380692
                                                jhutchins@bakerlaw.com
                                                **Ryan E. Harbin**
                                                Georgia Bar No. 370658

rharbin@bakerlaw.com
**Kristen Rasmussen**
Georgia Bar No. 135018
krasmussen@bakerlaw.com
1170 Peachtree Street, Suite 2400
Atlanta, GA 30309-7676
Telephone:  404.459.0050
Facsimile:  404.459.5734

**GEORGIA RESOURCE CENTER**
**Anna Arceneaux**
Georgia Bar No. 401554
anna.arceneaux@garesource.org
104 Marietta St. NW, Suite 260
Atlanta, GA 30303
(404) 222-9202

**ACLU FOUNDATION OF
GEORGIA**
**Cory Isaacson**
Georgia Bar No. 983797
cisaacson@acluga.org
**Andrés López-Delgado**
Georgia Bar No. 552876
adelgado@acluga.org
P.O. Box 77208
Atlanta, GA 30357
(404) 594-2723

*Attorneys for Plaintiff Michael Nance*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will automatically serve all counsel of record in this matter.

*/s/ Ryan E. Harbin*
Georgia Bar No. 370658
rharbin@bakerlaw.com
*Attorney for Plaintiff*

# EXHIBIT 1

# GEORGIA DEPARTMENT OF CORRECTIONS

# GEORGIA DIAGNOSTIC AND CLASSIFICATION PRISON

# LETHAL INJECTION PROCEDURES



**July 17, 2012**

**GEORGIA DIAGNOSTIC AND CLASSIFICATION PRISON
LETHAL INJECTION PROCEDURES**

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Pre-execution Procedures | 1 |
| | A.  Designation and Notification of Staff | 1 |
| | B.  Restrictions | 1 |
| II. | Day of Execution | 2 |
| | A.  Within Three (3) Hours of the Execution | 2 |
| | B.  Within Two (2) Hours of the Execution | 2 |
| | C.  Within One (1) Hour of the Execution | 3 |
| | D.  Preparation of the Condemned | 4 |
| | E.  Execution Process | 5 |
| | F.  Post Execution | 6 |
| | G.  Interment of Condemned | 6 |
| | H.  Critical Incident Debriefing | 6 |

TABLE OF APPENDICES

| | **TITLE** | **PAGE** |
|---|---|---|
| Appendix I | IV Team – Instructions | 7 |
| Appendix II | Controlled Chemical Handling Procedures for Execution by Lethal Injection with Attachments | 8-11 |

**LETHAL INJECTION PROCEDURES**

I.   **PRE-EXECUTION PROCEDURES**

    A.   **Designation and Notification of Staff**

The individuals listed below shall be present at each execution.  At least twelve (12) hours prior to the execution, the Warden or the Warden's designee will notify the following individuals of the time and date of execution and place to report for assignment.  These individuals will then acknowledge receipt of the Warden's notification.  The Warden has the authority to waive the twelve (12) hour requirement on an emergency basis.

    1.   Warden or Deputy Warden who shall ensure that the court ordered execution is carried out.

    2.   Two (2) Assistants or more as directed by the Warden.

    3.   Two (2) Physicians - to determine when death supervenes.

    4.   One (1) Physician - to provide medical assistance during the execution process (may be one of the Physicians identified in I.A.3 above).

    5.   IV Team - to consist of two (2) or more trained personnel, including at least one (1) Nurse, to provide intravenous access.

    6.   Six (6) Correctional Officers to serve as a Special Escort Team who will apply restraints to the condemned during the execution process.

    7.   Injection Team to consist of three (3) trained staff members to inject solutions into the intravenous port(s) during the execution process.

    8.   One (1) Chaplain to administer to the spiritual needs of the condemned and to provide a prayer on the condemned's behalf upon request.

    9.   Security personnel as appropriate.

    B.   **Restrictions:**

No photographic, audio, video, recording, or computerized equipment will be permitted in the Execution Chamber or Execution Witness Room except as

specifically authorized by the Warden.  Only pencils, note pads, or other writing materials issued and controlled by designated GDC staff will be permitted.

## II.    DAY OF EXECUTION

### A.  Within Three (3) Hours of Execution

Within three (3) hours of the scheduled execution, the following tasks shall be performed:

1.  A communications check will be performed.

2.  Telephone circuits and private lines between the Command Center (CP1), Execution Chamber (CP2), and the Front Gate (CP3) will be checked.

3.  The Execution Chamber and Execution Witness Room will be inspected as directed by the Warden.

4.  A radio check between the Command Center, Execution Chamber, and Front Gate will be initiated.

### B.  Within Two (2) Hours of Execution

Within two (2) hours of the scheduled execution, the following tasks shall be performed:

1.  Chemicals will be delivered to the H-5 Chemical Room by the Deputy Warden of Security or Correctional Major.

2.  The IV Team will perform a check of all necessary equipment and instruments.

3.  Communications Check - The same procedure will be followed as at three (3) hours prior to the execution as specified in Paragraph II.A.

4.  The Execution Chamber and Execution Witness Room will be inspected as directed by Warden.

5.  The condemned will be prepared in accordance with prior responsibilities previously designated by Warden.

6.  The condemned may visit with clergy.

7.  An opportunity for the condemned to make a last statement will be provided. Any such statement will be recorded by designated staff.

8.  A shower and clean clothing will be provided to the condemned.

9.  A designated staff member shall confirm the presence of witnesses required by O.C.G.A.§17-10-41 to attend the execution.  Any final instructions will be issued by the Warden.

10. A designated staff member shall confirm the presence of the witnesses designated and approved by the Commissioner. Instructions will be issued to the witnesses to assure an understanding of their conduct in the Execution Witness Room and while being escorted to and from the Execution Witness Room.  All witnesses are to have previously acknowledged, in writing, their understanding and agreement to abide by the rules, regulations, and procedures of the GDC.

## C.  Within One (1) Hour of Execution

Within one (1) hour of the scheduled execution, the following tasks shall be performed:

1.  The IV Team will perform a check of all necessary equipment and instruments.

2.  The designated staff members will prepare lethal injection syringes.

3.  Medical staff will perform a test on the heart monitor.

4.  The condemned will be offered a mild sedative by a Physician.

5.  Special Escort Team members will ensure that all straps are in place and functional on the execution gurney.

6.  Communications Check: The same communications check procedures specified in Paragraph II.A. above will be repeated.  In addition, the telephone lines between the Command Center (CP1), the Execution Chamber (CP2), and the Front Gate (CP3) are to remain open beginning thirty (30) minutes prior to the scheduled execution.

7.  The Execution Chamber and Execution Witness Room will be inspected as directed by the Warden.

8.  Attendees and those required by O.C.G.A. §17-10-41 to attend executions will be issued additional instructions, and will be escorted to the Execution Chamber or Execution Witness Room as appropriate. Any witnesses for the condemned inmate, any media representatives, and the State's witnesses will be processed, instructed, and transported separately.

9.  Upon arrival at the Execution Witness Room, witnesses and media representatives will be confirmed. The media representative designated to observe the preparation of the condemned will be identified and confirmed. The presence of witnesses requested by the condemned and those approved by the Commissioner, including media representatives, will be confirmed.

**D. Preparation of the Condemned**

1.  The condemned inmate will be escorted to the lethal injection gurney by member(s) of the Special Escort Team approximately twenty (20) minutes prior to the time of the execution. The Special Escort Team will securely control the movements of the condemned from the holding cell to the execution chamber.

2.  The Special Escort Team will secure the condemned to the gurney by attaching restraints to the arms, legs, and body of the condemned.

3.  The IV Team will provide two (2) intravenous accesses into the condemned. If the veins are such that intravenous access cannot be provided, a Physician will provide access by central venous cannulation or other medically approved alternative.

4.  Heart monitor leads will be applied to the condemned by a Nurse from the IV Team.

5.  Witnesses will be escorted to the Execution Witness Room.

6.  The Warden will introduce himself to witnesses and issue final instructions regarding the execution.

7.  The Warden will ask the condemned if he has anything to add to the final statement. Any additional statement will be limited to two (2) minutes. The statement will be recorded by designated staff. A prayer will be offered if requested by the condemned. The prayer will be limited to two (2) minutes.

8.  The condemned will be read the Execution Order of the Court.

9.  Execution officials will take their places.

10. The Attorney General, or the Attorney General's designee, shall advise the Commissioner as to whether or not to proceed.  The Commissioner then instructs the Warden as to whether or not to proceed.

**E. Execution Process**

Upon the Order of the Warden, the execution process will proceed as follows:

1.  A staff member designated by the Warden will monitor the time when the injection process begins.

2.  The first member of the Injection Team will inject one (1) syringe containing 2.5 grams of Pentobarbital (labeled #1).  The second member of the Injection Team will inject an additional syringe containing 2.5 grams of Pentobarbital (labeled #2).  The third member of the Injection Team will inject one (1) syringe containing 60 cubic centimeters of Saline (labeled #3), ensuring a steady, even flow of the chemical.

3.  Throughout the lethal injection process, an IV Nurse will monitor the progress of the injection in the Execution Chamber to ensure proper delivery of chemicals and to monitor for any signs of consciousness.  If the IV Nurse in the execution chamber observes a problem with intravenous flow, the Nurse will inform the attending Physician, who will inform the Warden as to whether or not using an alternative intravenous access is appropriate.  The Warden will give the appropriate instructions to the Injection Team.

4.  If, after a sufficient time for death to have occurred, the condemned individual exhibits visible signs of life, the Warden shall instruct the Injection Team to administer an additional 5 grams of Pentobarbital followed by 60 cubic centimeters of Saline as outlined in Subsection 2 of Section E. above.

5.  Upon completion of the injection of the final syringe, the designated Physician will advise the Warden when the heart monitor indicates that the condemned inmate is deceased.  The Warden and the two Physicians will then enter the Execution Chamber to determine if death has occurred.

6.  If the condemned shows residual signs of life within a reasonable period after all injections have been completed, steps 1 through 5 above will be repeated upon the order of the Warden.

7.  The Warden will then announce the fact of death to the witnesses.  The

Execution Chamber curtains will then be closed.

**F.  Post Execution**

1.  The witnesses and media representatives will be escorted from the Execution Witness Room.  Media representatives will be immediately escorted from the prison to the press area.

2.  The IV lines will be detached by the IV Team, the straps will be removed by the Special Escort Team, and the body will be removed from the gurney.  The body will be placed in a body bag and placed on a stretcher provided by the State Crime Lab.  The body will then be taken by van to the State Crime Lab for a postmortem examination.

3.  Press release: The Public Information Officer for the Department of Corrections will advise news media that the Order of the Court has been carried out.

**G.  Interment of Condemned.**

1.  The Warden or designee and attending physicians will prepare a certificate of execution and certify the fact of execution.  The certificate will be forwarded to the Clerk of Superior Court of the county in which the sentence was pronounced.  A copy shall be forwarded to the Commissioner.

2.  The last statement of the condemned will be forwarded to the Central Office, as appropriate.

3.  Interment: The body may be released to the relatives at their expense or should the nearest relative of the condemned so desire, the body will be carried to the former home of the person so executed, if in the State of Georgia.  The expense of such transportation to the former home shall be paid by the Ordinary, County Commissioners, or person(s) having the charge of county funds in which the person was convicted. (O.C.G.A. § 17-10-43).

4.  If the relatives do not claim the body of the executed person, interment will be in accordance with Board of Corrections Rule 125-2-4.20.

**H.  Critical Incident Debriefing**

1.  Staff participants will be seen by the Critical Incident Debriefing Team within seventy-two (72) hours of each execution or as soon as possible.

## APPENDIX I

### IV TEAM - INSTRUCTIONS

**SET UP PROCEDURE:**

1.  The Warden or designee will have two (2) intravenous infusion devices placed in the veins of the condemned and a Saline solution available for an infusion medium.  Those persons engaged in this activity will be referred to as the IV Team.

2.  An IV administration set will be inserted into the outlet of the bag of Normal Saline IV solution.  Two (2) IV bags will be set up in this manner.

3.  The IV tubing shall be cleared of air and made ready for use.

4.  The standard procedure for providing IV access will be used.

5.  The IV tubing for both set-ups will be connected to the receiving port of the IV access; one for the primary vein, the other for the secondary vein.

6.  At this point, the administration sets shall be running at a slow rate of flow (KVO), and ready for the insertion of syringes containing the lethal agents.  The Warden or his designee shall maintain observation of both set-ups to ensure that the rate of flow is uninterrupted.  **NO FURTHER ACTION** shall be taken until the prearranged signal to start the injection of lethal agents is given by the Warden or designee.

## APPENDIX II

## CONTROLLED CHEMICAL HANDLING PROCEDURES FOR EXECUTION BY LETHAL INJECTION

The following procedures will be utilized to obtain controlled chemicals, transport the chemicals to the Execution Chamber at the Georgia Diagnostic and Classification Prison (GDCP), dispose of and/or return unused chemicals to the GDCP Pharmacy.

A. The certificate issued by the Drug Enforcement Agency (DEA), United States Department of Justice will be posted in the medical room of the GDCP Execution Chamber. A copy of the certificate will be kept on file at the GDCP Pharmacy.

B. All controlled materials, blank "Controlled Chemical Disposition Record" forms, and a lockable transport case will be kept in the GDCP Pharmacy.

C. The designated key ring, located in the Tunnel Entrance Restricted Key Box, will be utilized to gain access to the chemical storage containers, transport case and the temporary chemical storage containers located in the Execution Chamber. Access to this key ring and the receipt and/or transportation of chemicals is restricted to: Deputy Warden for Security, Correctional Major, and designated Pharmacist. In an emergency, the Warden of GDCP may designate another official this duty.

D. On the day of a scheduled execution, one of the authorized staff members will draw the proper keys, proceed to the pharmacy and procure the appropriate amount of chemicals.

E. The appropriate amount of chemicals to be issued is as follows: Pentobarbital – a total of 15 grams of the chemical.

F. During the procedures outlined in step #4, the "Controlled Chemical Disposition Record" will be initiated at this time. The Pharmacy will keep a temporary copy upon issuance. The original will be kept with the chemicals in the transport case. The appropriate sections will be completed as needed.

G. Chemicals will be delivered to the Execution Chamber and locked in the chemical storage container.

H. Within one hour of the scheduled execution, the chemicals will be drawn into syringes to be used by the Injection Team by a trained staff member supervised by a nurse.

I. Chemicals will be drawn up as follows:

    1. Pentobarbital – 2.5grams – Syringe #1 .

      2.   Pentobarbital – 2.5 grams – Syringe # 2.

      3.   Saline Solution – 60 cubic centimeters each - Syringe # 3.

J.  A secondary set of Syringe Numbers 1, 2 and 3 will be prepared in the manner outlined above in section I if an additional dosage of Pentobarbital is needed. The secondary set of Pentobarbital will not be drawn into Syringe Numbers 1 and 2 prior to the execution, but will be immediately available, together with the appropriate syringes, if an additional dosage of Pentobarbital is needed.

K.  The remaining chemicals, along with appropriate syringes will be locked in the transport case and placed in the mechanical room in the event they are needed.

L.  At the conclusion of the execution, the amount of each chemical injected into the condemned inmate is to be recorded on the Controlled Chemical Disposition Record form, along with the date, time, inmate name and number.

M.  Any chemical loaded into a syringe that is not used will be destroyed by disposing of the chemicals in an appropriate manner.  This must be witnessed and the section completed and signed on the Controlled Chemical Disposition form.

N.  Any unused chemicals will be returned to the pharmacy via the transport case and the remainder of the Controlled Chemical Disposition Record form will be completed.

O.  The original Controlled Chemical Disposition Record form will be retained by the Pharmacy.  A copy will be sent to the Warden's office for inclusion into the Execution file.

P.  An inventory will be kept by the Pharmacy of each chemical used and returned.  The Controlled Chemical Disposition form and the inventory logs will be kept in a red binder attached to the chemical storage container.

Q.  The attachments 1 through 2 will be completed and submitted as required.

    Attachments:        (1) Controlled Chemical Disposition Form
                        (2) Inventory Log for Pentobarbital

**CONTROLLED CHEMICAL DISPOSITION RECORD (LETHAL INJECTION)**                      APPENDIX II – ATTACHMENT 1

**GEORGIA DEPARTMENT OF CORRECTIONS – GDCP**

CHEMICALS DISPENSED BY GDCP PHARMACY

| Name of Chemical – Amount | Date Issued | Lot # | Expiration | # of Vials |
|---|---|---|---|---|
| PENTOBARBITAL          15 GRAMS | | | | |
| | | | | |
| | | | | |
| | | | | |

| ISSUED BY:  (SIGN AND PRINT NAME) | RECEIVED BY:  (SIGN AND PRINT NAME) | DEPT/LOCATION |
|---|---|---|
| | | |

CHEMICALS ADMINISTERED BY INJECTION TEAM

| DATE | TIME | INMATE NAME/NUMBER | CHEMICALS | QTY |
|---|---|---|---|---|
| | | | PENTOBARBITAL | |
| | | | | |
| | | | | |
| | | | | |

CHEMICALS DESTROYED

| CHEMICALS DESTROYED | QTY | # OF SYRINGES | DATE DESTROYED | DEPT/LOCATION |
|---|---|---|---|---|
| PENTOBARBITAL | | | | |
| | | | | |
| | | | | |
| | | | | |

| DESTROYED BY: (SIGN AND PRINT NAME) | WITNESSED BY: (SIGN AND PRINT NAME) | DEPT/LOCATION |
|---|---|---|
| | | |

CHEMICALS RETURNED TO GDCP PHARMACY

| DATE RETURNED | CHEMICAL RETURNED | QTY RETURNED | # OF VIALS |
|---|---|---|---|
| | PENTOBARBITAL | | |
| | | | |
| | | | |
| | | | |

| RETURNED BY: (SIGN AND PRINT NAME) | RECEIVED BY: (SIGN AND PRINT NAME) | DEPT/LOCATION |
|---|---|---|
| | | |

**CONTROLLED CHEMICAL INVENTORY LOG**

**GEORGIA DEPARTMENT OF CORRECTIONS – GDCP**

| DATE | PACKAGE SIZE | BEGINNING INVENTORY | AMOUNT DISPENSED | DATE DISPENSED | SUBTOTAL | AMOUNT RETURNED | DATE RETURNED | TOTAL INVENTORY | INITIALS |
|------|------|------|------|------|------|------|------|------|------|
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |      |      |      |



# UNDER DEATH SENTENCE RECEPTION AND HOLDING PROCEDURES

## APRIL 2011



**GEORGIA DEPARTMENT OF CORRECTIONS**
*COMMISSIONER'S OFFICE*
*300 PATROL ROAD*
*3ᴿᴰ FLOOR, GIBSON HALL*
*FORSYTH, GA 30129*



Nathan Deal
*Governor*

Brian Owens
*Commissioner*

April 12, 2011

To:  Warden Carl Humphrey
Georgia Diagnostic and Classification Prison

From:  Commissioner Brian Owens

Subject:  Holding and Preparation of UDS Inmates for Execution

The following procedures will be utilized for the holding and preparation of UDS inmates for execution.

## HOLDING AND PREPARATION FOR EXECUTION

### A.  PREPARATION FOR EXECUTION AND TIME OF EXECUTION

The order of the court will specify a time span for the execution. A specific date and time within the designated time span will be established and announced by the Commissioner to the appropriate personnel on a need to know basis. The date and time for execution should be finalized seven (7) days in advance.

### B.  NOTIFICATION

Upon receipt, the Warden or his designee shall read to the condemned inmate the Order of Execution issued by the court of conviction. The condemned will sign the Order acknowledging notification of the Order and the signature of the condemned will be witnessed by the staff member and same will provide the condemned with a copy of the Order. If the condemned refuses to acknowledge receipt of the Order of Execution, the Warden or designee shall read the Order of the Court and acknowledge receipt for the condemned, in writing, which shall be witnessed by a staff member other than the Warden and attached to the Order.

### C.  DEATH WATCH

After the Order of Execution is read to the condemned inmate, the condemned shall be given a medical examination and searched for contraband. Following the medical examination and search, the condemned will be moved to a cell designated by the Warden. Once the condemned is moved to the cell designated by the Warden, the condemned inmate's personal property will not be returned to the condemned, with the exception of legal materials, religious materials or personal items expressly permitted, in writing, by the Warden. The Warden may provide the condemned with any additional State issued property as the Warden deems appropriate. A list of all property specifically approved by the Warden shall be kept with the activity log, and initialed by the Warden.

A minimum of two (2) officers shall be assigned to observe the condemned at all times during Death Watch. If the condemned is a female, security will be maintained by female security personnel. Duties shall be established by the Deputy Warden of Security and the Warden. No other correctional staff, or civilian personnel, except medical personnel, shall be allowed in the Death Watch area without approval of the Warden or designee. No inmates are allowed in the Death Watch area.

(1)    Observation

     (a)    Security of the Execution Chamber and the Execution Witness Room is the responsibility of the Warden. Security briefings shall be held as appropriate.

     (b)    The officer in charge on each shift shall supervise the use of all items retained by the condemned and shall maintain a log of all activities of the condemned to include, but not limited to, the times of feeding, showering and all other occurrences.

     (c)    All meals for the condemned during the Death Watch shall be prepared/procured and delivered by the Food Service Director, or designee. The activity log sheet shall reflect all names of persons delivering meals, menu items served the condemned and whether they were consumed or returned, to include date and time.

     (d)    A communication check, by telephone/radio, shall be made every thirty (30) minutes, on a continuous basis, during this period by the Death Watch Officer to the institution's control center. This communication check shall be logged.

(2)    Medical

     (a)    Sick call will be in accordance with institution Rules and Regulations prior to the Death Watch period. During the Death Watch, sick call will be in the Death Watch area.

     (b)    Request for medical attention by the condemned, in addition to sick call, will be provided in the Death Watch area unless determined inappropriate by the Medical Authority. A medical determination to examine or treat the condemned in other than the Death Watch area should be coordinated with the Warden as soon as possible.

## D.    PERSONAL PROPERTY OF THE CONDEMNED

(1)    The condemned's personal property will be packed by institutional staff and secured in the
Property Room.

(2)    The inventory process and sealing of personal property shall be performed by an institutional officer and another staff person as designated by the Warden.

(3)    The condemned shall sign a completed inventory sheet, which shall be witnessed by the officer and the other staff member.

    (4)     The condemned shall indicate, in writing, on the completed inventory sheet the recipient of all personal property.

## E.    STATE ISSUED ITEMS

    (1)     The condemned shall be furnished with the following state-issued items while under Death Watch:

- 1 Mattress
- 1 Pillow
- 1 Pillowcase
- 2 Blankets (as necessary)
- 2 Sheets
- 2 Towels
- 1 Bar of Soap
- 1 Shirt
- 1 Jacket (provided as needed)
- 1 Pair of Pants
- 1 Pair of Boxer Shorts
- 1 Pair of Socks
- 1 Pair of Shower Shoes
- 1 Religious Material
- 1 Toothbrush and Tube of Toothpaste (provided as needed)
- 1 Use of Electric Razor (Cordless)

The Warden may provide the condemned with any additional State issued property, as the Warden deems appropriate. A list of all property specifically approved by the Warden shall be kept with the activity log and initialed by the Warden.

    (2)     The condemned may be provided the following upon request:

- 1 Television Set to be Located Outside the Cell
- 1 Radio to be Located Outside the Cell
- Playing Cards
- Stationery
- Newspapers and Magazines (as approved by the Warden)
- Personal Items Approved by the Warden or Designee (limited to essential needs)

    (3)     Any variation from the above list shall be approved by the Warden or designee, in writing, and attached to the activity log.

    (4)     The condemned will not be provided with the following:

- Razors or Blades (other than cordless electric)
- Belts
- T-Shirts

F.    **FUNERAL ARRANGEMENTS**

At the beginning of the Death Watch, if not previously done, the condemned may specify, in writing, his or her request for funeral arrangements. This information shall be conveyed if necessary to the inmate's family, or others as appropriate, by the Warden or his designee at least twelve (12) hours prior to the scheduled execution.

G.    **WITNESSES WHO MAY BE PRESENT**

(1)    Witnesses to the execution beyond those specifically prescribed by law or elsewhere in this procedure must be approved by the Commissioner prior to the day of the scheduled execution.

    (a)    Restrictions:

        (1)    No photographic, audio, recording, or computerized equipment will be permitted in the execution chamber or witness room except as specifically authorized by the Warden. All pencils, note pads, etc. will be issued and controlled by designated GDC staff.

        (2)    Space limitations may limit the number of witnesses to be present in the execution witness room. Witnesses will be selected as outlined below:

(2)    Five (5) witnesses selected by the condemned. These witnesses may not consist of inmate or victim family members unless approved by the Commissioner of the Georgia Department of Corrections.

(3)    Five (5) witnesses representing the news media organizations. Media representatives shall be determined as follows:

    (a)    The Georgia Bureau Chief of the Associated Press Wire Services may designate one news reporter to be its media representative.

    (b)    The Georgia Press Association, through its Executive Director, may designate two pool newspaper reporters to be its media representatives, including one pool reporter from a newspaper published within the county in which the condemned was convicted.

    (c)    The Georgia Association of Broadcasters, through its President, may designate two pool news reporters to be its representatives for the electronic media, including one television or radio reporter from the county in which the condemned was convicted.

    (d)    The names of the news reporters representing the above mentioned classes or news media and designated alternates, shall be communicated telephonically to the Commissioner of the Department of Corrections at least twenty-four (24) hours prior to an execution.

(e)     All approved media witnesses will be certified in writing by the Commissioner to the Warden of the Georgia Diagnostic and Classification Prison.

(f)     In the event that more than one execution is carried out in a single day, the same media representatives shall be the witnesses for those executions.  The newspaper and broadcast representatives from the county of conviction will change if the offenders to be executed are from different counties.

(g)     Upon entering the Georgia Diagnostic and Classification Prison, each media representative must present sufficient evidence to establish his/her identity to the Warden or designee that he/she is entitled access to the press conference interview. This shall include a current photo I.D. Pencils, pens, notebooks, etc., will not be allowed; these items will be provided by Department of Corrections staff.  Facility policy prohibits witnesses wearing or bringing jewelry or other personal items into the facility.

(4)    Not less than five (5) witnesses approved in writing by the Commissioner of the Department of Corrections.

(a)     The Commissioner of the Department of Corrections may approve five (5) or more witnesses to be present in the witness room.  These witnesses may include officials with the Executive, Judicial or Legislative Branch of Government, or private citizens.  The Commissioner's Office shall maintain a tentative list of witnesses and keep the list updated.

(b)     The Commissioner may approve one or more  witnesses representing the victim(s). Requests of this nature will be received by the Commissioner no later than twelve (12) business hours prior to the day of the scheduled execution.

(c)     All approved witnesses will be certified in writing by the Commissioner to the Warden of the Georgia Diagnostic and Classification Prison prior to the time of the scheduled execution, if possible. Prior to the time of the execution, the Warden shall confirm participation.

**H.    Witnesses: Request of the Condemned**

If the condemned person so desires, the following may be present at such execution: his/her counsel, relatives, clergymen and friends, (OCGA 17-10-41), pursuant to approval as outlined in 12.1.1.  The condemned may update the names of those he/she desires to be present at the execution with the Commissioner's approval.  These names shall be recorded in writing, witnessed and maintained by the Warden or designee.

(1)    Not later than twelve (12) hours prior to time of execution those witnesses requested by the condemned shall be contacted by the Warden or designee in the most expeditious and appropriate method of communication to confirm the request and advise them of the time and date of the execution, assembly, orientation and escort procedures to the execution witness room.

I.   **Witnesses - Other**

(1)   Those witnesses to the execution required by law shall be under the supervision of the Warden of the institution or designee and shall appear at the institution at a time and place as directed by the Warden.

(2)   Those witnesses requested by the condemned shall appear at the institution no later than two (2) hours prior to the execution for orientation and escort to the execution witness room (refer to Paragraph 12.2).

(3)   Those witnesses to the execution who are approved by the Commissioner of the Georgia Department of Corrections shall appear at the institution no later than two (2) hours prior to the execution for orientation and escort to the execution witness room.

J.   **MEDIA INFORMATION AND PUBLIC INFORMATION OFFICE**

(1)   News media representatives shall not be allowed to visit any inmate at the institution during the DeathWatch.

(2)   Briefings for news media representatives shall be conducted as appropriate during the Death Watch and immediately after the execution by the Public Information Officer or designee at a time and place designated by the Warden of the institution.

(3)   Broadcast reporters will be allowed to broadcast live from a pre-designated area on the grounds of the institution during the hours designated by the Warden on the day of the execution.  A delay in the execution may require that these hours be adjusted accordingly.

K.   **VISITATION**

The condemned shall be allowed contact visits the day prior to and the day of the execution with family, friends, private clergy and his legal representatives as approved by the Warden.  Except as otherwise noted below, normal visitation policies will apply.

(1)   If possible, all visitors should be processed into the institution at one time and placed in the room provided.  A maximum of  five (5) visitors at a time shall be allowed in the institution at one time.

(2)   The condemned may eat an institutional meal while in the visiting room with his visitors.  Visitors may purchase an institutional meal which may be consumed in the visitation area in the presence of the condemned.

(3)   Attorney(s) shall be allowed to visit the condemned upon approval of the Warden or designee.

L.   **VICTIM'S FAMILY/RELATIVES**

A staff member will be designated to care for any of the victim's family who remain within the institution during the execution.  A room shall be designated for this purpose.

**M.**   **TELEPHONE**

Telephone access shall be provided to the condemned, with the following limitations:

(1)   Telephone calls shall be in accordance to institutional rules and regulations prior to Death Watch.

(2)   At least one (1) fifteen (15) minute call per day during Death Watch, unless otherwise approved by the Warden; a phone will be provided to the condemned, unless otherwise restricted by the Warden.

(3)   All telephone calls shall be made collect, unless the Warden makes exceptions.

(4)   All telephone calls are to be made between the hours of 8:00 a.m. and 6:00 p.m. unless otherwise approved by the Warden.

(5)   Incoming calls for the condemned will be referred to the Warden or designee for screening and approval.  Such calls will be denied unless the purpose involves family and/or legal matters requiring the condemned's involvement.



# GEORGIA DEPARTMENT OF CORRECTIONS

*COMMISSIONER'S OFFICE*
*300 PATROL ROAD*
*3RD FLOOR, GIBSON HALL*
*FORSYTH, GA 30129*



Nathan Deal
*Governor*

Brian Owens
*Commissioner*

April 12, 2011

To:        Warden Carl Humphrey
           Georgia Diagnostic and Classification Prison

From:      Commissioner Brian Owens

Subject:   Delivery, Processing and Confinement of UDS Inmates

The following procedures will be utilized for the deliver, processing and confinement of UDS inmates once sentenced by the court.

## I.    RECEPTION OF UNDER DEATH SENTENCE (UDS) CASES

### A.    THE SENTENCE

(1)    Upon a verdict or judgement of death made by a jury or a judge, it is the responsibility of the Clerk of Court, in which said sentence is pronounced, to forward a certified copy of said sentence to the Warden of the Georgia Diagnostic and Classification Prison not less than ten (10) days prior to the first day of the seven (7) day execution period as fixed by the court (OCGA 17-10-33).

(2)    Where the date for execution has passed for any reason, i.e., appeal, habeas corpus, State Board of Pardons and Paroles, etc., the judge of the Superior Court of the county where the case was tried shall have the power and authority to fix a seven (7) day period for the execution of the original sentence.  Such order shall fix the seven (7) day period not less that ten (10) nor more than twenty (20) days from the date of such order.  Such order shall be sent immediately to the Warden of the Georgia Diagnostic and Classification Prison (OCGA 17-10-40).

(3)    Upon notification, the Warden of the Georgia Diagnostic and Classification Prison will immediately notify the Commissioner and forward a copy of the sentence (Execution Order) or other orders.

(4)    Upon notification as described in 1.3, the Commissioner will forward a copy of the execution order to the Governor (Attention: Legal Counsel, Governor's Office) and the Chairman of the State Board of Pardons and Paroles.

**B.    Delivery of the Condemned Person**

(1)    In all cases in which the defendant is sentenced to be executed, it shall be the duty of the trial judge in passing sentence, to direct that the defendant be delivered to the Commissioner of the Georgia Department of Corrections for execution at such state prison as may be designated by said Commissioner, (OCGA 17-10-38).

(2)    It shall be the duty of the sheriff of the county in which such convicted person is so sentenced to convey such convicted person to said state prison not more than twenty (20) nor less than two (2) days prior to the time fixed in the sentence for execution of the condemned person unless otherwise directed by the State Board of Pardons and Paroles, or unless a stay of execution has been caused by appeal, granting of a new trial, or other order of a court of competent jurisdiction, and the expense for transporting of said person to the state prison for the purpose of execution shall be paid by the Ordinary of the County wherein the conviction was had, or the Board of County Commissioners, the County Commissioner, or other person or persons having charge of the county funds, out of any funds on hand in the treasury of such County, (OCGA 17-10-33).

(3)    The Commissioner will issue assignment orders to the Sheriff of the County of conviction and forward copies of the Order and sentencing documents to the state prison.  Delivery of the condemned person by the Sheriff will be arranged and coordinated by the Commissioner between the Sheriff of the County concerned and the Warden of the prison.

(4)    Persons under death sentence incarcerated at institutions other than the institution designated by the Commissioner as the execution site will be transferred to the execution site approximately two (2) days prior to the scheduled execution date.  Details of such transfer will be coordinated by the Commissioner.

**C.    ADMISSION PROCESSING**

Upon arrival of the condemned person at the Georgia Diagnostic and Classification Prison or Arrendale State Prison, he/she will be processed through regular inmate admission procedures, to include security search, medical examination, fingerprint, photograph, personal history information, etc., to include a complete diagnostic evaluation, a copy of which will be provided to the Commissioner of the Department of Corrections, and the State Board of Pardons and Paroles.

**D.    CONFINEMENT**

The condemned person will be confined in a cell designated by the Warden.  Appropriate safeguards and security measures will be maintained as directed by the Warden.  Pending the invoking of the Death Watch, the condemned person will be maintained in accordance with Departmental Rules and Regulations, special regulations for persons under death sentence, and specific court order.  Persons delivered to the execution site less than thirty-six (36) hours prior to the time of execution, (refer to Paragraph 2.2), will be processed immediately and assigned to the Death Watch Cell.