UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL WADE NANCE,

        Plaintiff,

   v.

TYRONE OLIVER, Commissioner,
Georgia Department of Corrections,

        Defendant.

CIVIL ACTION NO.
1:20-CV-00107-JPB

## **ORDER**

This matter is before the Court following a bench trial on Michael Wade Nance's ("Plaintiff") claim that execution by lethal injection violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, Plaintiff alleges that the lethal injection protocol in Georgia presents a substantial risk of severe pain to him because of his medical conditions. This Court finds as follows:

**RELEVANT PROCEDURAL HISTORY**

Plaintiff—an inmate convicted of malice murder and sentenced to death—filed this action against Defendants[1] on January 8, 2020.  [Doc. 1].  Plaintiff filed an Amended Complaint on April 7, 2023.  [Doc. 58].  In the Amended Complaint, Plaintiff contends that an execution by lethal injection will violate his constitutional rights because his veins are compromised in such a way that it is likely that he will suffer "excruciating pain" during the execution.  Id. at 2. Plaintiff further asserts that pentobarbital—the lethal drug used to render Plaintiff unconscious and stop his heart—could be ineffective or less effective because of his continuous exposure to gabapentin—a different drug that Plaintiff uses to treat his chronic back pain.  Id.  The Court thus construes Plaintiff's Amended Complaint to contain two causes of action:  (1) a compromised vein claim; and (2) a gabapentin usage claim.  Ultimately, Plaintiff argues that because of these unique medical conditions, he faces a substantial risk of severe pain if the current execution protocols are utilized.  Id.  As an alternative to lethal injection, Plaintiff suggests death by firing squad.  Id.

---

[1] Defendants are Tyrone Oliver, the commissioner of the Georgia Department of Corrections, and Antoine Caldwell, the warden of the prison where Plaintiff is incarcerated.

The Court held a five-day bench trial from May 20, 2024, through May 24, 2024. After the trial, both parties filed post-trial briefs. [Docs. 151, 152 and 153]. The Court now sets forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

Numerous witnesses testified at the bench trial, including Defendants, experts for both parties, members of the execution team assigned to carry-out Plaintiff's execution and witnesses of previous executions. The facts of this case are divided into the following sections: (A) the execution protocol in Georgia; (B) the execution team's experience; (C) Plaintiff's veins and the effect, if any, on the execution; and (D) Plaintiff's gabapentin use and the effect, if any, on the execution.

**A.    The Execution Protocol in Georgia**

Under Georgia's current execution protocol, the State injects the death row inmate with five grams of pentobarbital. To inject the inmate with the drug, execution team nurses first obtain peripheral intravenous ("IV") access in two places, usually in each of the inmate's arms.[2] [Doc. 150, p. 73]. These nurses are

---

[2] If the nurses are unable to obtain peripheral IV access, a "physician will provide access by central venous cannulation" or through another "medically approved alternative."

fully qualified to place peripheral IVs and have extensive experience in obtaining

peripheral IV access.  Id. at 73, 137–38.  After the IVs are placed, both IVs are

checked for proper flow and a decision is made about which IV will be used for the

primary infusion.  Id. at 74.

In proceeding with the execution,

> [t]he first member of the Injection Team will inject one (1) syringe containing 2.5 grams of Pentobarbital (labeled #1).  The second member of the Injection Team will inject an additional syringe containing 2.5 grams of Pentobarbital (labeled #2).  The third member of the Injection Team will inject one (1) syringe containing 60 cubic centimeters of Saline (labeled #3), ensuring a steady, even flow of the chemical.

Joint Exhibit 1, p. 7.  The syringes containing the pentobarbital are injected

over a one-minute period.  The final syringe, which contains saline, is used

to ensure that the entirety of the pentobarbital is delivered and pushed into

the inmate's cardiovascular system.  [Doc. 147, p. 204].

During the execution, an IV nurse stands next to the inmate and monitors the

injection site and the flow in the IV lines.  [Doc. 150, p. 48].  This monitoring is

---

Joint Exhibit 1, p. 6.  Central venous cannulation, or placing a central line, is described by the National Institutes of Health as a "standard" procedure.

4

done so that any problems with the IV, such as extravasation,[3] can be detected.  If

the nurse notices a problem with the IV, he or she notifies the physician who

consults with the warden about how to proceed.  Joint Exhibit 1, p. 7.

**B.** **The Execution Team's Experience**

Several members of the execution team testified during the trial, including

one anonymous doctor and one anonymous nurse.

Doctor Doe, who is a member of the execution team, is a board-certified

surgeon with over twenty years of experience.  [Doc. 150, pp. 10–11].  Notably,

Dr. Doe has participated in sixteen executions in Georgia, and in each of those

executions, he oversaw the placement of the peripheral IVs in the inmates.  Id. at

17.  Under oath, Dr. Doe explained that he and the other injection team members

arrive hours before the scheduled execution and check all the supplies that they

may need.  Id. at 68–67.  Once the execution begins and after the IVs are placed,

Dr. Doe stated that he and the nurses check and test to ensure that the IV tubing for

the two peripheral lines are flowing properly.  Id. at 71–72.  Importantly, Dr. Doe

was confident that the medical staff would be able to identify and correct any

---

[3] Extravasation, or a blown vein, occurs when the liquid in the IV line leaves the patient's vein and enters the soft tissue surrounding the vein.  [Doc. 147, p. 99].  Extravasation can be painful because of the "physical displacement of the skin."  Id.  Extravasation can also cause a burning sensation.  Id.  If extravasation occurs, it could render the pentobarbital ineffective or less effective.  Id.

issues with the IV tubing.  Id.  According to Dr. Doe, at all times during an execution, the medical team looks for signs of extravasation or other indications that the inmate is in significant pain.  Id. at 75, 81.

Dr. Doe testified that the medical team has a plan in place to deal with complications, such as extravasation and/or the inability to obtain peripheral IV access.  Id. at 77.  Indeed, during one execution, Dr. Doe placed a central line.  Id. at 17.  This central line placement, which took approximately one hour, was just one of an estimated 7,000 central lines that Dr. Doe has placed over the course of his career.  Id. at 41–44.  While Dr. Doe has never failed to obtain access via a central line, Dr. Doe admitted that some of these patients experienced complications, such as a nick to the femoral artery or a collapsed lung.[4]  Id. at 66–67, 86.  Dr. Doe maintained, however, that the complications were not serious in the vast majority of the cases.  Id.  Dr. Doe asserted that when he inserted the central line during the previous execution, the inmate never communicated to medical staff that he was in significant pain.  Id. at 79.  Dr. Doe testified confidently that with six possible sites to insert a central line, if that were even

---

[4] Dr. Doe stated that if he needs to place a central line for Plaintiff's execution, he will use the right femoral vein because "the possibility of a pneumothorax [or collapsed lung] is zero."  [Doc. 150, p. 66].

necessary, no substantial likelihood exists that he would not be able to obtain

central access.  Id. at 84–85.

Nurse Doe, a registered nurse with over twenty years of experience, also

testified at trial.  Nurse Doe explained that throughout his career, he has placed

"thousands" of peripheral IVs.  Id. at 107, 124.  As a result of this experience,

Nurse Doe knows whether there is "good blood flow" and whether "it's a good . . .

IV."  Id. at 134–35.  According to Nurse Doe, he knows what to do in the event of

an extravasation and how to treat it, and he testified that an extravasation is not a

terribly painful event.  Id. at 143–44 ("It's just the issue of having to take [the IV]

out and to be stuck again.").  In addition to having knowledge about IVs and the

complications that can arise from IVs, Nurse Doe also has experience monitoring

central lines and knows how to check a central line to determine whether it is

flowing properly.  Id. at 146–47.

Particularly relevant here, Nurse Doe has participated in seven executions in

Georgia, and in five of those, he served on the IV team that placed the peripheral

IVs in the inmate's arms.  Id. at 108, 110.  During the executions, Nurse Doe

monitors the IV site and the inmate for signs of distress, and he believes that his

twenty years of nursing experience has qualified him to make such assessments. Id. at 136.

## C.    **Plaintiff's Veins**

In this case, Plaintiff alleges that obtaining peripheral IV access will be difficult, if not impossible, because his veins are severely compromised. He further asserts that the condition of his veins raises the risk that his vein would blow upon injection, causing pain or rendering the pentobarbital ineffective. Experts provided testimony regarding Plaintiff's veins. The Court will begin by discussing Plaintiff's expert testimony.

### 1.  Dr. David B. Waisel

Dr. David B. Waisel, an anesthesiologist, testified for Plaintiff. According to Dr. Waisel, Plaintiff's veins are heavily scarred and tortuous. [Doc. 147, p. 91]. As a result, Dr. Waisel thinks that obtaining peripheral IV access on Plaintiff would be difficult because the needle could be blocked by scar tissue and fail to enter the vein, or scar tissue could dislodge the catheter from the needle. Id. at 97. Importantly, although Dr. Waisel claimed that under the conditions of an execution the IV would be less stable, Dr. Waisel admitted that he had "no argument with the fact that a skilled clinician could insert a small IV in [Plaintiff]." Id. at 138. Dr. Waisel even conceded that if he had to obtain IV access on Plaintiff, he would not

immediately opt for a central line; rather, he would obtain a peripheral IV on Plaintiff's upper arm.  Id. at 146.

In his testimony, Dr. Waisel expressed concern that the nature of Plaintiff's veins could increase the risk of extravasation.  Indeed, Dr. Waisel asserted that Plaintiff's veins are heavily tortuous and have lost elasticity, making it more likely that the vein will rupture.  Id. at 91.  Moreover, Dr. Waisel suggested that members of the injection team are not qualified to notice increased resistance in the syringes, which could indicate extravasation.  Id. at 105–06.  He also stated that extravasation is more likely due to the high rate at which pentobarbital is injected. Id.  Dr. Waisel further asserted that the execution team members are not positioned properly to even notice if there is an IV problem.  Id. at 109–10.

In addition to addressing Plaintiff's veins, Dr. Waisel discussed the feasibility and risks of conducting the execution via central line access on Plaintiff.[5]  In Dr. Waisel's view, a central line placed in the subclavian vein presents the risk of two potentially painful conditions:  a pneumothorax or a lung puncture, which would cause the lung to collapse.  Id. at 118–20.  Further, a central line placed in either the femoral vein or jugular vein presents the risk of hitting an artery.  Id. at 140.  Based on the condition of Plaintiff's veins and the risks of the

---

[5] Central lines are used if peripheral IV access cannot be obtained.

central line, Dr. Waisel opined that lethal injection would result in "a substantial risk for undue pain and suffering."  Id. at 91.

Although not specific to Plaintiff, Dr. Waisel testified that he reviewed autopsies of other inmates executed in Georgia.  Dr. Waisel hypothesized that because most of the autopsies showed pulmonary edema (fluid in the lungs) and frothiness indicating negative pressure pulmonary edema, insufficient anesthesia could be causing inmates' throats to slam shut and suffocate them while they are still partially conscious.  Id. at 123.

### 2.  Dr. Joseph F. Antognini

Dr. Joseph F. Antognini, also an anesthesiologist, testified as an expert for Defendants.  Disagreeing with Plaintiff's expert, Dr. Antognini opined that "venous access should not be an issue" and that the risk of problems or complications are "pretty low."  Id. at 186–87, 189.  To support his opinion, Dr. Antognini referenced Plaintiff's recent medical history, which indicated that since this lawsuit was filed, Plaintiff has undergone three different medical procedures—all of which required venous access through peripheral IVs—and no problems were noted in Plaintiff's medical records.  Id. at 187–89.

Dr. Antognini also conducted a visual and physical examination of Plaintiff to support his opinion regarding Plaintiff's veins.[6]  According to Dr. Antognini, the physical examination showed that Plaintiff had visible veins on his hands that could be used to place a peripheral IV.  Id. at 112–13, 115.  Dr. Antognini asserted that these veins did not exhibit scarring.  Id. at 114, 119, 122, 124–25.

Dr. Antognini addressed Plaintiff's concerns that the locations of the physicians and nurses during the execution would mean that they would not be able to detect an extravasation or other signs of stress.  In his testimony, Dr. Antognini noted that the nurse stands directly behind the inmate and explained that the nurses on the execution team have the training and experience necessary to recognize signs of distress, complications, problems with breathing and pain.  Id. at 197.  Dr. Antognini explained that the number of physicians and nurses in close

---

[6] This examination occurred on the first day of trial.  Dr. Antognini used his hand as a tourniquet to make Plaintiff's veins swell and then released his hand and lifted Plaintiff's arm, causing the blood to drain out of the vein.  [Doc. 147, p. 186].  According to Dr. Antognini,

> [the blood drainage] indicates that there's good venous return, that there's no blockage, that there's—if there's any scarring, it's very limited, because if there was, that blood wouldn't drain very easily at all.  And if the veins were actually completely scarred, then they would stay that way, you would not see any type of collapse because there's no blood there, it's just scar. His veins looked very good in that sense.

Id. at 186–87.  The parties submitted photographs of Plaintiff's arms and veins as they appeared on the first day of trial.

proximity to the inmate exceeds that of a typical hospital setting.  Id. at 198.  In

addition, given the large volume of fluids injected into the inmate, Dr. Antognini

testified that it would be unlikely for an extravasation to go unnoticed.  Id. at 204.

In addition to addressing the condition of Plaintiff's veins and the ability to

obtain peripheral IV access, Dr. Antognini discussed central line placement.

Importantly, Dr. Antognini explained that placing a central line causes only

minimal pain because a local anesthetic is injected to the area so that the pain is the

same as inserting a peripheral IV.  Id. at 200–01.  He noted that it is quite rare for a

physician to be unable to obtain venous access through a central line, and using an

ultrasound machine, which will be available to the physicians and nurses at

Georgia executions, decreases the risk of complications.  Id. at 202–03.  More

generally, Dr. Antognini did not have any concerns about the execution team

physician having difficulty obtaining a central line.  Id. at 203.

Dr. Antognini also discussed the other concerns raised by Plaintiff's expert.

Specifically, as to the claim that extravasation could cause the inmate's throat to

shut down and deprive the inmate of oxygen while partially conscious, Dr.

Antognini countered that if the pentobarbital stopped flowing to the inmate, the

inmate would wake up.  Id. at 215.  Dr. Antognini also disagreed with the assertion

that the pentobarbital causes pulmonary edema.  Indeed, Dr. Antognini testified

that drugs that work in a manner similar to pentobarbital do not cause pulmonary edema.  Id.  Dr. Antognini opined that even if pulmonary edema occurred before death, the inmate would not be aware of it because he would be rendered unconscious by the pentobarbital.  Id. at 216.

D.    **Plaintiff's Gabapentin Usage**

Turning to Plaintiff's second claim, Plaintiff contends that his gabapentin usage—a medication that he takes to treat his back pain—has made his brain less responsive to other drugs, such as pentobarbital.  Consequently, Plaintiff asserts that he could suffer substantial pain as a result.

Limited expert testimony was presented regarding the gabapentin claim. While Dr. Waisel opined that Plaintiff's high and increasing dose of gabapentin could reduce the effectiveness of pentobarbital, he admitted that "we have no idea what the effects of gabapentin may be with pentobarbital, it's an unknown, and we don't have an analog to really look at it."  [Doc. 147, p. 127].  Dr. Waisel further conceded that "no one actually knows" whether an inmate's use of gabapentin would affect the efficacy of pentobarbital.  Id. at 166–67.  Ultimately, Dr. Waisel acknowledged that gabapentin was not substantially likely to affect the pentobarbital.  Id. at 167.

Dr. Antognini also provided testimony concerning Plaintiff's gabapentin use. In his view, Plaintiff's gabapentin use would not complicate the execution. Indeed, Dr. Antognini noted that in other executions where the inmates were taking gabapentin, those inmates died, on average, sooner than the inmates not taking gabapentin. Id. at 190–91 ("So, if anything, the evidence suggests that gabapentin would be synergistic with pentobarbital, not antagonistic or causing resistance.").

## CONCLUSIONS OF LAW

The Court now sets forth its conclusions of law. As previously stated, Plaintiff brings two claims challenging the method of execution—one regarding his compromised veins and the other pertaining to his gabapentin usage. To challenge a lethal injection protocol under the Eighth Amendment, a prisoner must show by a preponderance of the evidence that "(1) the lethal injection protocol in question creates 'a substantial risk of serious harm,' and (2) there are 'known and available alternatives' that are 'feasible, readily implemented,' and that will 'in fact significantly reduce [the] substantial risk of severe pain.'" Gissendaner v. Comm'r, Ga. Dep't of Corr., 779 F.3d 1275, 1283 (11th Cir. 2015) (alteration in original) (quoting Chavez v. Fla. SP Warden, 742 F.3d 1267, 1272 (11th Cir. 2014)). "If a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering

to its current method of execution, then a State's refusal to change its method can be viewed as 'cruel and unusual' under the Eighth Amendment." Baze v. Rees, 553 U.S. 35, 52 (2008). Notably, "the Eighth Amendment does not guarantee a prisoner a painless death," but instead forbids punishment that intensifies the sentence of death with a cruel superaddition of "terror, pain, or disgrace." Bucklew v. Precythe, 587 U.S. 119, 132 (2019).

The Court will first address Plaintiff's claim regarding his compromised veins.

## A. **Compromised Veins**

In this claim, Plaintiff essentially asserts that the execution team will have problems inserting the peripheral IVs and that those IVs may be more likely to rupture, thus causing a substantial risk that he will experience excruciating pain. Plaintiff also argues that the alternative IV access methods (such as the placement of a central line) will also result in a substantial risk of severe pain. A substantial risk is a risk that is "sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers." Wellons v. Comm'r, Ga. Dep't of Corrs., 754 F.3d 1260, 1265 (11th Cir. 2014) (emphasis omitted).

The Court is not convinced that the condition of Plaintiff's veins makes it unlikely that the execution team will be able to obtain a peripheral IV (or if they are able to obtain a peripheral IV, there would be complications).  Indeed, the evidence at trial showed that after Plaintiff initiated this action, he has had three medical procedures—all of which required peripheral IV access.  Importantly, Plaintiff's medical records lack any evidence that there were problems in obtaining peripheral IV access or complications once the peripheral IVs were inserted.

Specifically, in February of 2022, Plaintiff had a colonoscopy during which he had a peripheral IV inserted with no apparent complications.  Joint Exhibit 19.  According to the affidavit of a registered nurse associated with the procedure, "IV access was established with a 20- or 22-gauge needle and a catheter," and "[t]he IV was placed in [Plaintiff's] left arm in the antecubital area, which is the triangular-shaped depression over the anterior aspect of the elbow joint."  Id. at 1–2.

Next, in December of 2022, Plaintiff had a CT scan, which required peripheral IV access to inject a contrast solution.  Joint Exhibit 18.  The physician who reviewed the CT images stated in her declaration that the images she reviewed from the scans "do not reveal any concerns regarding the delivery of the contrast," and that "[i]f there had been problems with the delivery of the contrast media, this would have been evident in the CT scan images."  Id. at 2.

Finally, in February of 2023, Plaintiff received an MRI, which also required IV contrast.  Joint Exhibit 20.  Similar to the CT scan, the physician reviewing the MRI images testified through a declaration that there were no issues with the "delivery of the contrast media" throughout Plaintiff's circulatory system.  Id. at 2.

Plaintiff asserts that these records are "of limited utility in determining [Plaintiff's] venous quality" because they lack information about the difficulty or ease with which the IV access was obtained and lack critical information about the equipment used in the procedure.  [Doc. 153, p. 6].  This Court is not persuaded. In the Court's view, the recent medical procedures show that medical professionals successfully established peripheral IV access on Plaintiff on at least three occasions in recent years.  In addition to the ability to establish peripheral IV access, these procedures also show a lack of complications.[7]  Plaintiff, who bears the burden of proof, failed to present any evidence that he suffered significant discomfort regarding those IVs and failed to proffer any medical records which

---

[7] Plaintiff's expert agreed that the medical records indicated that there was no extravasation during the procedures.  [Doc. 147, pp. 136–37].  This is important because the pentobarbital is injected at approximately the same rate as the contrast used in CT scans and MRIs.  Id. at 144–46.

would show that there were problems obtaining IV access.[8]  Plaintiff also failed to

show that there were any complications during these procedures.  In light of this

recent medical history, the Court concludes that Plaintiff failed to show by a

preponderance of the evidence that his veins are so compromised that it is

substantially likely that the execution team would be unable to obtain peripheral

IVs.[9]  Moreover, Plaintiff failed to show that once peripheral IV access is obtained,

that it is substantially likely that complications would arise causing him severe

pain.  If a complication occurred, the weight of the evidence presented at the trial

indicates that the medical professionals at the execution would be able to detect it

and address it in a manner that would not cause constitutionally intolerable pain or

discomfort.

---

[8] Although the evidence concerning these medical procedures is the most convincing to the Court, the Court cannot ignore Plaintiff's expert's admission that if he needed to obtain IV access on Plaintiff, he would attempt to obtain it via peripheral IV on Plaintiff's upper arm.  [Doc. 148, p. 146].  This admission tempers Dr. Waisel's opinion that any attempt to obtain a peripheral IV would be substantially likely to fail.

[9] Plaintiff has been able to establish, at most, that IV nurses *might* have to stick him multiple times in attempting to obtain IV access.  Significantly, the Eleventh Circuit Court of Appeals has already rejected Plaintiff's claim that repeated needle sticks would violate his constitutional rights.  Nance v. Comm'r, Ga. Dep't of Corr., 59 F.4th 1149, 1157 (11th Cir. 2023).

Although the Court is not persuaded that the execution team will have difficulty placing the peripheral IVs or that complications will arise from those IVs, the Court will nevertheless address Plaintiff's argument that the alternative IV access methods (such as the placement of a central line) will result in a substantial risk of severe pain. As noted previously, placing a central line is a routine procedure, and Dr. Doe has placed approximately 7,000 central lines over the course of his career. Importantly, Dr. Doe has never once been unable to place a central line.[10] While the Court recognizes that complications can, and do, arise in placing central lines, it is clear to the Court that Dr. Doe is well-qualified to perform the task. As Dr. Doe testified, he would first opt to place a central line in the femoral vein, where, at worst, he could nick the artery. [Doc. 150, p. 64]. If he did nick the artery, which has happened to him in the past, he would simply remove the needle, apply pressure "and then stick the vein." Id. at 66–67. In the Court's view, Plaintiff has not sufficiently refuted the clear implication of Dr. Doe's testimony that placing a central line in the femoral vein is not particularly

---

[10] Because Plaintiff has not shown that Dr. Doe would be unable to place a central line, and based on Dr. Doe's 7,000 successful placements, the Court need not address Plaintiff's other arguments regarding the possible alternatives to central line placement (an intraosseous IV or a cutdown procedure). In short, given the very low possibility that a cutdown or an intraosseous IV would be required, Plaintiff has failed to demonstrate a substantial likelihood of harm from one of those methods.

difficult and the possible complications are, generally, not particularly serious or painful.[11]

It is worth noting that both the anonymous nurse and Dr. Doe are highly qualified and have extensive experience. Their testimony was credible, and it is evident that they will carefully work to obtain IV access in as safe and painless a manner as possible and thereafter monitor Plaintiff to identify any problems or complications. Because the nurse and Dr. Doe are medical professionals with decades of experience, and they have all the equipment needed to perform their tasks, there is no basis for this Court to find that they would be unable to deal with a complication should one occur.[12]

---

[11] Even if Plaintiff could show that the placement of a central line was substantially likely to cause severe pain or discomfort, these arguments have nothing to do with Plaintiff's physical condition. In other words, the condition of Plaintiff's veins and his gabapentin use are seemingly unrelated to the ability to place a central line. Thus, Plaintiff's challenge to the State's use of a central line is a facial rather than an as-applied claim. As held by the Eleventh Circuit, Plaintiff's facial challenges to the State's lethal injection protocol are untimely. Nance, 59 F.4th at 1153.

[12] Plaintiff additionally argued that a substantial risk of severe pain exists because Department of Corrections officials, who are not medical professionals, do not train the doctors and nurses about what to do if there are medical complications. Plaintiff further asserted that a substantial risk of severe pain was likely because two of the injection team members are not medically trained. The Court disagrees with both arguments. First, Plaintiff has not shown that the well-trained medical officials need training from Department of Corrections Officials concerning medical emergencies. Second, severe pain is unlikely because a physician stands with the injection team members during the execution, [Doc. 150, pp. 71, 74–75], and nurses are stationed by the inmate to look for

In summary, this Court finds that Plaintiff has failed to show that his

execution by lethal injection under Georgia's protocol is substantially likely to

result in his suffering an unconstitutional level of pain or discomfort.  None of the

evidence that Plaintiff presented demonstrated that the State, through executing

him under the protocol, would intensify the sentence of death with a cruel

superaddition of terror, pain or disgrace.[13]  See Bucklew, 587 U.S. at 133.

**B. Gabapentin Use**

As stated previously, Plaintiff alleges that his gabapentin use has made his

brain less receptive to pentobarbital, and therefore a substantial risk exists that he

will suffer unreasonable pain during the execution.  The Court is not persuaded.

---

signs of extravasation or distress, id. at 136.  This Court recognizes that Plaintiff also
expressed concern about the State's failure to always follow the protocol exactly and
some corrections officials' confusion concerning the protocol.  Given the training and
experience of those involved in executions, the Court finds that this concern is
unfounded.

[13] Plaintiff additionally argued that lethal injection carries a risk of pulmonary edema
because of inadequate drug delivery.  To support this claim, Plaintiff presented autopsy
results of prior executions that showed that many of the inmates had pulmonary edema or
fluid in their lungs before their death.  This Court finds that Plaintiff's conclusions
concerning pulmonary edema are speculative.  Defendants established that the amount of
pentobarbital injected during an execution is more than ten times the amount that would
quickly render a person unconscious and that the possibility of an incomplete delivery of
pentobarbital is very low.  As a result, Plaintiff has failed to demonstrate a substantial
likelihood that pulmonary edema will result in severe pain or suffering.

Dr. Waisel was the only witness that Plaintiff presented to support his gabapentin claim.[14]  Problematically for Plaintiff, Dr. Waisel's testimony concerning Plaintiff's gabapentin use was purely speculative.  Indeed, when discussing Plaintiff's gabapentin use, he used language like "may have" or "potentially" could have some form of adverse effect.  Plaintiff's Exhibit 1, pp. 13–14.  Dr. Waisel acknowledged that the medical community has "no idea what the effects of gabapentin may be with pentobarbital." [Doc. 147, p. 127].  He further testified that he did not believe that there is a substantial likelihood that Plaintiff's gabapentin use would affect the efficacy of the pentobarbital during the execution.  Id. at 167.  Given these admissions and the speculative nature of the testimony, the claim fails.  In summary, the evidence that Plaintiff presented is insufficient to support a finding that his use of gabapentin is substantially likely to cause serious pain or needless suffering in violation of the Eighth Amendment.[15]

---

[14] Defendants also had one witness who testified as to the gabapentin use, and he testified that gabapentin use might enhance the effect of the pentobarbital.  [Doc. 147, p. 190].

[15] The Court recognizes that Plaintiff now argues in his post-trial brief that his gabapentin use should be viewed in tandem with his compromised veins as what could be considered a cumulative effect claim.  [Doc. 151, p. 35].  Even if this argument was properly before the Court, Plaintiff did not present *any* evidence at trial to support his new theory.  As such, the claim fails under this alternate theory.

## CONCLUSION

For the foregoing reasons, this Court concludes that Plaintiff has failed to demonstrate that he is entitled to relief.  Specifically, Plaintiff failed to show that he was likely to suffer severe pain cognizable under the Eight Amendment either because of the condition of his veins or his gabapentin use.  Because Plaintiff failed to make this required showing, the Court has no need to address the argument that the firing squad is a feasible and readily available alternative that could significantly reduce his pain.  Accordingly, the Clerk is **DIRECTED** to enter judgment in favor of Defendants.[16]  The Clerk is **FURTHER DIRECTED** to close this case.

**SO ORDERED** this 13th day of February, 2025.

J. P. BOULEE
United States District Judge

---

[16] Plaintiff's Motion to Strike [Doc. 154] is **DENIED** as moot because the Court did not rely on any of the challenged statements contained within the motion.